**FMC CORPORATION, Plaintiff,**

v.

**CONTROL SOLUTIONS,
INC., Defendant.**

Civil Action No. 05–cv–01553.

United States District Court,
E.D. Pennsylvania.

May 16, 2005.

Abbe F. Fletman, Kelly Dobbs Bunting, Wolf, Block, Schorr & Solis–Cohen, LLP, Philadelphia, PA, for Plaintiff.

Control Solutions, Inc., Pasadena, TX, pro se.

John A. Rothschild, Fox, Rothschild, O'Brien & Frankel, Aleksander Jerzy Goranin, Hangley, Aronchick, Segal & Pudlin, Philadelphia, PA, for Defendant.

### MEMORANDUM and ORDER

PRATTER, District Judge.

## I. BACKGROUND, PROCEDURAL HISTORY AND SUMMARY DECISION

This matter concerns the alleged copyright infringement of a label used on pesticide products. The immediate issue involves a request for a preliminary injunction. A hearing having been held and briefs having been submitted, the Court will issue the preliminary injunction for the reasons and upon the terms discussed below.

Plaintiff FMC Corporation ("FMC") is headquartered in Philadelphia, Pennsylvania, and holds itself out to be "one of the world's foremost, diversified chemical companies with leading positions in agricultural, industrial and consumer markets."[1] Defendant Control Solutions, Inc. ("CSI"), a producer of generic pesticide products, located in Pasadena, Texas, employs approximately 45 people and competes with FMC and others in the distribution of pesticides. The specialty products division at FMC, the division responsible for the TalstarOne pesticide/termiticide has a comparable number of employees to CSI. See 4/21/05 Hr. Tr. at 8. Plaintiff FMC develops, manufactures, markets and distributes pest control products for professional and home use. CSI's business is to manufacture and market pesticide products containing generic active ingredients. 4/22/05 Hr. Tr. at 96. FMC alleges that CSI is willfully violating FMC's copyright on the TalstarOne pesticide product label and seeks to enjoin CSI from selling its

---

1. See http://www.fmc.com (last visited May 15, 2005).

generic Bifen I/T pesticide using an allegedly infringing product label.[2]

Pesticide product labels are heavily regulated by the United States Environmental Protection Agency (the "EPA") pursuant to the Federal Insecticide Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136, *et seq.* Consistent with FIFRA, the process by which regulated pesticide products are registered for sale in the United States involves submission and approval of detailed product labels, typically in booklet or pamphlet form, providing specifically mandated information about hazards and directions for use, including identification of the pests to which the pesticides are directed and the application and mixing rates of the pesticides for a wide variety of uses. Portions of the TalstarOne pesticide product label that FMC claims CSI is infringing were composed by FMC in conformity with specific legal and regulatory standards and guidelines. These standards and guidelines were established by Congress and the EPA as requirements for registering pesticide products for sale.

CSI began distributing a generic brand of pesticide containing bifenthrin, Bifen I/T, more than five years after FMC's patent on bifenthrin expired. Bifen I/T contains the exact ingredients, in the identical proportions as, and is thus functionally equivalent to, FMC's TalstarOne product. CSI's Bifen I/T label was prepared and submitted to the EPA as part of, in EPA parlance (or, as familiarly termed by the witnesses, "EPA speak"), a "me-too" submission. In fact, Mr. Joe Blake, CSI's Director for Regulatory Affairs, initially represented to the EPA that the Bifen I/T product would be not only a me-too submission but also a "re-pack" of Talstar TC Flowable, the immediate predecessor product to TalstarOne. A re-pack registration with the EPA generally takes less time and requires less information in order to secure EPA approval. *See* 4/22/05 Hr. Tr. at 116–118. However, FMC claims it never sold any Talstar product to CSI.[3] Thus, if FMC's claim on this point is accurate, it is impossible that CSI could have submitted a re-pack of the FMC product.[4]

**2.** FMC's infringement claim against CSI is based on a comparison of FMC's TalstarOne pesticide product label to CSI's Bifen I/T pesticide product label. A comparison of these specific labels indicates that they are nearly verbatim, as discussed more fully *infra.* CSI concedes as much, including that, at the time it was creating its product, Bifen I/T, CSI's Director of Regulatory Affairs merely went to the EPA's website and copied the then-existing FMC Talstar TC Flowable label word-for-word before merely changing "Talstar TC Flowable" to "Bifen I/T". *See* 4/22/05 Hr. Tr. at 103–05; *see also,* Bifen I/T color-coded label (Ex. E to Motion for TRO). Talstar TC Flowable is the immediate predecessor product to TalstarOne and the TalstarOne label is a direct derivative of the label CSI copied. See 4/21/05 Hr. Tr. at 21–22.

**3.** Ex. D–12, letter from Lawrence A. Miller, Consultant to CSI, to David B. Weinberg, Esq., outside counsel to FMC, dated March 1, 2004 ("You are correct that CSI does not purchase its bifenthrin from FMC ...").

**4.** Mr. Blake did not correct his mistake concerning the re-pack claim until November 2003, if ever:

[Ms. Fletman:] ... At your deposition ... you told me ... that **to your knowledge no [Bifen I/T] had been repackaged**?

A That is correct.

Q And now you're saying that since you went to the deposition and I pointed this out to you, you went back and you checked?

A Yes, I had no knowledge of it beforehand.

Q Who did you check with?

A [ CSI's President] Mark Boyd.

Q **How much was repackaged?**

A **I don't know.**

With regard to alleged copyright infringement by CSI of FMC's TalstarOne product label, FMC delivered a cease and desist letter to CSI's chief executive officer on March 4, 2005. FMC received no response until March 28, 2005, when CSI announced that it had retained counsel and rejected FMC's claims of copyright infringement. Therefore, FMC contends that as of March 4, 2005, CSI's alleged copyright violation is willful and knowing.[5] Moreover, FMC contends that without immediate injunctive action, CSI will continue to illegally profit from FMC's copyrighted and proprietary property, including by granting sub-registration rights to two other companies, Phoenix Environmental Care LLC ("Phoenix") and Regal Chemical ("Regal"), to use a label substantially similar to the label CSI copied from FMC. See 4/22/05 Hr. Tr. at 118–120.

FMC filed its Complaint (Docket No. 1) and, pursuant to Fed.R.Civ.P. 65, its Motion for Temporary Restraining Order and Rule to Show Cause Why a Preliminary Injunction Should Not Issue (Docket No. 3) and Motion for Expedited Discovery, alleging that CSI deliberately appropriated FMC's copyrighted product label for TalstarOne™ Multi–Insecticide, for CSI's Bifen/IT product rather than incurring the expense of independently developing a label of its own. At this stage in the litigation, namely, assessing whether a preliminary injunction should issue, the Court is to decide whether CSI's admittedly virtually verbatim copying of FMC's product label violates federal copyright law and justifies the entry of preliminary injunctive relief.

Following a phone conference with the parties, the Court denied the Motion for Temporary Restraining Order, granted expedited discovery for both parties, scheduled an intermediate conference call to monitor the expedited discovery, established a supplemental briefing schedule and scheduled an evidentiary hearing and oral argument on the request for a preliminary injunction. The evidentiary hearing and oral argument was held on April 21 and 22, 2005.

FMC seeks a preliminary injunction ordering CSI, and anyone or any entity acting in concert with CSI, to: (1) stop manufacturing the infringing label or causing the label to be manufactured; (2) halt using the infringing label; (3) stop placing any product that has the infringing label affixed to it into the stream of commerce; (4) recall all products bearing the infringing label that are not already in the hands of an end user; (5) destroy all existing infringing labels; and (6) immediately provide all of Bifen I/T's distributors, customers and sub-registrants with a copy of the preliminary injunction order.

Q Have you ever informed the EPA that you are-well, did you ask Mr. Boyd whether Control Solutions is formulating [Bifen I/T]?

A Yes.

Q Is it?

A Yes.

Q Have you ever informed the EPA?

A Yes.

Q And when did you do that?

A November, 2003, we submitted an application for formulation amendment.

4/22/05 Hr. Tr. at 122–23 (emphasis added).

5. However, because CSI admits that it never made any attempt to independently create a label for the generic Bifen I/T, but intentionally copied FMC's label nearly verbatim as part of its standard business plan, FMC claims that CSI's willful violation commenced at the time of the initial copying. This issue remains for trial.

For the reasons stated below, the Court finds that CSI is willfully violating FMC's copyright to the TalstarOne product label and, as a result, is knowingly and willfully selling its Bifen I/T product with an infringing product label. CSI is also knowingly and willingly assisting other generic manufacturers to label their respective bifenthrin-based products with a similarly infringing label. Therefore, for the reasons detailed below, consistent with FMC's relief request, *supra*, save subpart (4) and a portion of subpart (6), the Court issues a preliminary injunction to prevent further sales or facilitation of sales of any product utilizing a product label that has been approved by the EPA (or is currently within the EPA review process) based upon a me-too submission by CSI that consists of a product label based on the virtually verbatim copying of the TalstarOne label. The Court also requires that FMC post a $100,000 bond in accordance with Fed. R.Civ.P. 65(c).

A trial on the merits of the claims and defenses will follow promptly.

## II. FACTUAL BACKGROUND

### A. *Development of Bifenthrin Products*

More than 20 years ago, FMC developed bifenthrin, a chemical that eradicates insects, including termites and other pests. *See* Declaration of Linda Froelich ("Froelich Decl.") ¶ 4. FMC obtained a patent protecting bifenthrin and later registered its technical formulation and end-use products with the EPA and state pesticide regulatory authorities. Froelich Decl. ¶ 5. Several of the FMC end-use product registrations are on pesticide products commonly sold to distributors for use by professional exterminators, landscapers and

other pest management professionals. *Id.* By December 9, 1997, FMC's patent on bifenthrin had expired, permitting its manufacture, use, and sale by producers of generic pesticides. Froelich Decl. ¶ 6. CSI is such a producer of generic pesticides.

In August 2003, FMC introduced TalstarOne, in which bifenthrin is the active ingredient. TalstarOne is the successor product to a number of FMC's prior pesticide products. Froelich Decl. ¶ 7. TalstarOne is a multi-insecticide used to control many pests indoors and outdoors in residential, institutional, public, commercial and industrial buildings, and on lawns, ornamental plants, parks, recreational areas and athletic fields.[6] *Id.* FMC contends that TalstarOne, distributed throughout the United States, is one of FMC's most successful products. Froelich Decl. ¶ 8. FMC further contends that TalstarOne is considered to be a premier insecticide for use by pest management professionals in the United States. Froelich Decl. ¶ 9.

FMC became aware of CSI's marketing efforts for CSI's Bifen I/T in late 2003 and early 2004. However, FMC did not attempt to assess whether CSI was violating FMC's copyright on the TalstarOne label until November 2004. After completing a comprehensive comparison of the CSI label against its own TalstarOne label, FMC concluded that the CSI label was a virtually identical copy of the FMC label and sent a cease and desist letter to CSI in early March 2005 alleging that CSI was violating the copyright on the TalstarOne label. CSI never inquired of FMC whether it could buy or license the rights to use or copy the TalstarOne label. 4/21/05 Hr. Tr. at 128. FMC has also sent other cease and desist letters to other competitors which FMC claims are also in violation of

---

**6.** TalstarOne is not available to lay consum-

ers. 4/21/05 Hr. Tr. at 7.

FMC's copyright. Neither FMC nor CSI has endeavored to notify either of CSI's two sub-registrants with regard to FMC's attempt to enforce its purported copyright to the TalstarOne label.[7]

## B. The TalstarOne Label

Before marketing TalstarOne in 2003, FMC contends that it engaged in "a long and arduous process" of drafting the detailed label. Froelich Decl. ¶ 10.[8] Pesticide labels do not consist of a mere list of ingredients. Froelich Decl. ¶ 11. Instead, they comprise multi-page pamphlets describing product uses, instructions for use and required warnings. *Id.* These pamphlets typically are attached to the product container. *Id.* For example, the TalstarOne label contains 16 pages of small type in booklet form. Froelich Decl. ¶ 13; TalstarOne Label (2004) (Pl.Ex. A to Motion for TRO). This label contains specific and detailed directions for use, directions for storage and disposal, information about application rates, precautionary statements and narrative text describing first-aid instructions and environmental, physical and chemical hazards. *Id.* FMC contends that the process of creating a pesticide label involves "creativity, time and money" and, for a label such as TalstarOne, is the result of "many years of careful product development and stewardship," as reflected by the particular words and phrases FMC uses on the label. *See* Froelich Decl. ¶ 12.[9]

---

7. Counsel for FMC informed the Court that FMC had not contacted the sub-registrants directly on this issue due to a concern for liability arising from a potential tortious interference claim by CSI. *See* 4/22/05 Hr. Tr. at 197.

8. Despite Ms. Froelich's references to the time and effort invested in creating the Talstar labels, it is not this "sweat of the brow" on which the Court holds in FMC's favor that, as a matter of law, FMC owns a legitimate, protectible copyright in its labels, but rather, as discussed *infra*, on the record thus established, this Court finds that FMC's labels include the necessary "creative spark" to qualify for copyright protection. Thus, the granting of a preliminary injunction is justified because FMC has shown a likelihood of success on the merits of it claims: (a) FMC holds a legitimate copyright; (b) that copyright has been infringed; (c) a presumption of irreparable harm exists; and (d) the balance of harms, discussed *infra*, weigh in FMC's favor.

9. Edwin F. Tinsworth, former Director of the EPA Registration Division of the Office of Pesticide Programs, testified, on FMC's behalf, with regard to FMC's reputation in the industry:

BY MS. FLETMAN:

Q ... you offered to Mr. Squires that you had an opinion based on your familiarity with FMC's labels compared to the labels of other clients of yours

[Mr. Tinsworth:] My opinion, and I'll tell you what I base it on also, is my experience with EPA, my 22 years in the Government, my consulting work, I know pesticides, and I spend a lot of time focusing on communication. And I believe that the FMC's labels, in addition to labels I've seen from other companies, there's a clear effort that's been put into those labels to make sure that information gets to the user in a way that they can understand it. And I think that that's appropriate. I think that it's part of what a company's stewardship program ought to be. It's not just putting a product out there that works and does what it's supposed to do and acts as it's intended to act, but it's also putting a product out there that can be used in an appropriate manner and that the users can understand it. And I think FMC does a good job with that.

## C. *FMC's Process of Creating the TalstarOne Label*

The TalstarOne label is based upon copyrighted labels for other FMC products that are no longer on the market. *See* Froelich Decl. ¶ 14.[10] The labels for the other products were created in 1992 and 1996. *Id.* Thereafter, the FMC labels were subject to significant review and revision, a process that FMC contends culminated in the TalstarOne label in its current form. *See* Froelich Decl. ¶ 15. More than two years ago, FMC decided to revise the information on its labels to produce the TalstarOne label. Froelich Decl. ¶ 16. That process began with FMC's field representatives who determined recommended uses for the product. *Id.* To redraft the label, FMC claims that it relied upon conference calls and product management team meetings. In-house field representatives discussed use rates and patterns for the new TalstarOne product. *Id.* After the field personnel prepared an initial draft of the TalstarOne label, FMC alleges that the label was sent to in-house marketing personnel for input. Froelich Decl. ¶ 17. The label also was sent to in-house product developers, who reviewed the draft label and provided comments.[11] *Id.* Pesticide manufacturers must follow the product label guidelines promulgated by the EPA, and FMC contends that its TalstarOne label complies with EPA requirements. *Id.* Before its final release, the FMC product development department re-reviewed the label for accuracy, the FMC registrations department assured that it adhered to the applicable EPA requirements, and the FMC marketing department finalized the language. *Id.*

Following the three-month in-house creation and review process, the TalstarOne label was sent to the EPA for review and approval in June 2003. *Id.* It took the EPA more than a month to approve the label. Froelich Decl. ¶ 19. After the EPA's final approval, the TalstarOne product label was subjected to an additional month of in-house review before FMC made its final determination that it was ready for use in product packaging. *Id.* As a result, FMC estimates that it spent more than 13 years and nearly $400,000 in the process of developing the current version of its TalstarOne label. Froelich Decl. ¶ 20; *see also*, TalstarOne label (2003) (Pl.Ex. B to Motion for TRO). The label was revised in 2004 to add directions for using certain containers and information about resistance that some insects may develop to the insecticide/termiticide. Froelich Decl. ¶ 21. Since the time of the product launch, FMC claims that it has spent more than $1 million promoting TalstarOne. Froelich Decl. ¶ 22.

---

4/22/05 Hr. Tr. at 70–71 (emphasis added).

10. Talstar TC Flowable resulted from the integration of two previously complementary products, Biflex TC Termiticide and Talstar Lawn and Tree Flowable. *See* 4/21/05 Hr. Tr. at 17–19. Subsequently, Talstar TC Flowable became TalstarOne after FMC developed more uses, "particularly around the food handling establishment uses, and adding a public health pest …, bedbugs, which is one pest that is particularly prevalent in this country in the past year to two years, and is increasing." 4/21/05 Hr. Tr. at 21–22.

11. In sum, FMC estimates a total of 513 man-days were involved in creating the current TalstarOne label, including man-days required to include informational language mandated by the EPA which is not subject to copyright protection. *See* 4/21/05 Hr. Tr. at 28–30. Some version of the TalstarOne label has been in the marketplace since 1992, when Biflex TC was first sold. *See* 4/21/05 Hr. Tr. at 53, 128. However, despite allegations to the contrary by CSI, no evidence was produced to the Court to support CSI's claim that FMC marketed a bifenthrin-based product before 1992. *See* 4/21/05 Hr. Tr. at 55.

#### D. FMC Registers the Copyright for each TalstarOne Label

FMC only recently filed its copyright registration for the TalstarOne Multi–Insecticide (2004) and TalstarOne Multi–Insecticide (2003) product labels. Froelich Decl. ¶ 23; Copyright Registration Certificates (Pl.Ex. C and D to TRO).[12] The registration certificates state that FMC's copyrighted label for TalstarOne was first published on July 1, 2003. *Id.*

#### E. CSI Copied and Refused to Stop Using the Infringing Label

CSI has made no evidentiary showing, and has not yet succeeded in undermining the material features of Ms. Froelich's testimony,[13] to contradict FMC's version of the facts which is summarized as follows.

In December 2003 FMC learned that CSI planned to compete in the market for bifenthrin-based products. *See* 4/21/05 Hr. Tr. at 96. By March 2004 FMC had received a version of the CSI label which FMC wanted in order to evaluate the merit of requiring CSI to compensate FMC for the data that FMC had compiled for its prior submissions to the EPA and upon which CSI would necessarily rely for its me-too registration of the competing product, Bifen I/T. *See* 4/21/05 Hr. Tr. at 96–98 [14]; 4/22/05 Hr. Tr. at 193–96. Data

---

12. Registration may appear to be a mere formality. However, a leading copyright law commentator has stated that, indeed, "the remedy of statutory damages may depend on a formality." *Schiffer Publishing, Ltd. v. Chronicle Books, LLC*, 2005 WL 67077 at *4 (E.D.Pa. Jan. 11, 2005) (*quoting* 2 NIMMER ON COPYRIGHT § 716[B][1][b][iii] ). Consistent with this theory, courts have consistently refused to award either statutory damages or attorney's fees if the infringement commences before the work is registered. *Id.; see, e.g., Johnson v. Jones*, 149 F.3d 494, 505–06 (6th Cir.1998); *Gamma Audio & Video v. Ean–Chea*, 11 F.3d 1106, 1111 (1st Cir. 1993); *Evans Newton, Inc. v. Chicago Sys. Software*, 793 F.2d 889, 896 (7th Cir., 1986); *Whelan Associates, Inc. v. Jaslow Dental Lab., Inc.*, 609 F.Supp. 1325, 1331–32 (E.D.Pa. 1985); *see also*, 17 U.S.C. § 405 ("Notice of copyright: Omission of notice on certain copies and phonorecords"); 504(c) ("Remedies for infringement: Damages and profits").

13. Ms. Froelich is a graduate of the College of Environmental Science and Forestry at Syracuse University. She has a B.S. in biology. She began working for FMC in 1977 in the fungicide laboratory screening compounds for fungicidal activity. Ms. Froelich later received her master's degree in plant pathology, after which, Ms. Froelich began performing studies for FMC that are required for pesticide registration. Ms. Froelich also worked on the research side of FMC's operations, where she performed screening for natural products, herbicides and insecticides. Then,

in 1990, she was assigned to the developmental group at FMC. Later, in 1998, she became the manager of FMC's residue chemistry group. In 2001, Ms. Froelich became the director of FMC's scientific and regulatory support group, the group that is responsible for all of the regulatory studies that are completed to support a product registration. Finally, in July 2003, she became the regulatory manager of the specialty products in North America crop groups. 4/21/05 Hr. Tr. at 8–10.

14. [Mr. Squires:] When did you first see it?

[Ms. Froelich:] November 14th, 2003.

Q Okay. So as of that time, you were aware that Control Solutions, Inc., had filed an amendment for its registration for a biphenthrin based product—

A Yes.

Q Okay. Do you recall receiving a copy of that letter?

A In December 2003.

Q Okay. Did that letter not—did you not realize when that letter was received that Control Solutions was going to be selling—was seeking to register to sell a biphenthrin based product?

A Yes, I realized that that's what they were doing.

compensation agreements are not uncommon in the industry. *See* 4/21/05 Hr. Tr. at 79–83.

FMC launched an in-house investigation in November 2004 to determine the extent of CSI's copyright infringement. Froelich Decl. ¶ 25. By February 2005, FMC completed a word-by-word comparison of the TalstarOne and Bifen I/T labels. Froelich Decl. ¶ 26. As a result, FMC concluded that the two labels were virtually identical. Froelich Decl. ¶¶ 26, 28. Rather than spending the necessary time and money to compose and develop its own label for Bifen I/T, it appeared to FMC that CSI literally copied the TalstarOne product label. Froelich Decl. ¶ 28. In fact, CSI admits copying the FMC label, nearly word-for-word. *See* Oral Deposition of Joe Blake [15], April 19, 2005 (hereafter "Blake Dep."), at 25–31. The only material difference between the labels for Bifen I/T and TalstarOne is the product name used on the label. *Id.; see also,* Bifen I/T color-coded label (Ex. E to Motion for TRO); TalstarOne label (Ex. A to Motion for TRO).

During the hearing on the motion for preliminary injunction, Mr. Blake testified

Q And the letter asked:
"To forward to [FMC] a copy of CSI's most recent draft labels."
Do you see that? It's almost to the bottom of the first page.
A Yes, I see it.
Q Did they not do so?
A They did that three months later.
Q Three months later. When?
A In March of 2004.

. . . . .

Q So you knew in March of 2004, what the content of Control Solutions, Inc.'s label about which you are complaining here in this court today of?
A Yes.

that CSI's business actually is premised on copying products and their labels:

[Ms. Fletman:] Were you responsible for the [Bifen I/T] label that is the subject of this proceeding?
[Mr. Blake:] I was.
Q And how did you prepare that label?
A **I copied the content of the other label** in the marketplace, in this case **the Talstar TC label** and copied the content **and submitted that to EPA as my label.**

4/22/05 Hr. Tr. at 97 (emphasis added). It took Mr. Blake no more than 10 minutes to make the necessary changes to the Talstar label:

Q . . . you went to the EPA Website, you found the label of a product that Control Solutions already wanted to sell, and you used that language exactly except for the name of your product?
A And the warranty statement on the—
Q And the warranty statement?

Q Why did you not act sooner?
A Because at the—during 2004, I was responsible for data compensation, negotiations with other generic companies, and I was not—I'm not educated in copyright law, so I didn't focus—I didn't know about this, and so therefore there was [no] attention put to it.

15. Mr. Blake, prior to serving as CSI's Director of Regulatory Affairs, was a salesman for CSI. He has a degree in business administration. 4/22/05 Hr. Tr. at 95–96. The training Mr. Blake received with regard to his position as CSI's Director of Regulatory Affairs consisted of three days of FIFRA boot camp and an CPDA workshop. *Id.*

A Right.

Q Okay. So your testimony is that you changed the name and

the warranty statement?

A Yes, ma'am.

Q And then you took that and you submitted it to the EPA?

A Yes, ma'am.

Q And in fact either you or someone at your direction sat

and typed word-for-word from one document to the other,

changing only the name and the warranty statement? [16]

A Yes, ma'am.

Q How long did it take you to make those changes from the

Talstar label into the [Bifen I/T] label?

A Minutes.

. . . . .

Q Ten minutes, 15 minutes?

A Ten minutes sounds fine.

4/22/05 Hr. Tr. at 107 (emphasis added). Although, Mr. Blake initially suggested that he thought that verbatim copying was required by the EPA, his testimony at the hearing drew back on that point:

Q But it is the Talstar TC Flowable label that you copied?

A Yes.

Q Now, the reason you copied the label, as I understand it

from your testimony today, was ... "that's the way I *do* all my

labels that are me-too labels"—

A Yes.

Q—did I correctly state what your answer was today?

A Yes.

. . . . .

Q Let me direct you, please, to Page 29 [of your deposition]. And I asked you,

on Line 21, "Why did you copy the label?"

And you answered, "In order for me to get a me-too

registration and expedited review, that is essentially what I

am required to do."

. . . . .

Q So, you copied the label so you could get a me-too

registration from EPA?

A Yes.

Q You copied the label so you could get an expedited

review, is that right?

A Yes.

Q And you copied the label because you believed that you

were somehow required to do so, is that correct?

A I use the word *required,* but the way I—that's the way

—that's my understanding of how I should do it.

Q Is it your understanding that EPA requires you to copy

the language of other labels to get a me-too registration?

A I don't know about the word required, but that's—it's

---

**16.** "No plagiarist can excuse the wrong by showing how much of the work he did not pirate." *Sheldon v. Metro–Goldwyn Pictures Corp.,* 81 F.2d 49, 56 (2d Cir.1936); *Nash v. CBS,* Inc. 899 F.2d 1537, 1541 (7th Cir.1990); *see also,* Nimmer on Copyright § 13.03[B][1][a].

my understanding in order to get a me-too registration for expedited review that my label has to be substantially similar or identical. So that I want the fastest review, so I make it identical.

Q And you want the fastest review because you want your product to get on the marketplace as fast as possible?

A Yes.

Q You're the one who's responsible for label creation at your company?

A Yes.

Q You've been responsible since 1998?

A Yes.

Q You were the only person who has ever had responsibility for that function at Control Solutions?

A Yes.

. . . . .

Q And you're the guy responsible for the label, yes?

A Yes, ma'am.

Q And you always copy the label except for the pieces that we talked about before?

A Yes, ma'am.

Q Okay. And it's fair to say that that's the way that Control Solutions does business?

A That's my common practice, yes, ma'am.

4/22/05 Hr. Tr. at 108–110; 4/22/05 Hr. Tr. at 125.

THE COURT: To your knowledge, has anyone with the CSI organization endeavored to compose a label?

THE WITNESS: No.

4/22/05 Hr. Tr. at 136.

Neither CSI nor Mr. Blake has ever attempted to submit to the EPA for expedited review for a me-too registration a substantially similar label (as opposed to a verbatim copy). Therefore, CSI has never had the occasion to learn whether, at a minimum, paraphrased language could be used to secure a me-too registration for that purpose:

[Ms. Fletman:] ... Am I correct that, as you sit here today, you don't know how EPA would react to a me-too registration where you changed the label language from the underlying label?

. . . . .

A Yes, ma'am.

Q—you haven't changed any language in a label from the underlying product when you've submitted it to EPA, have you?

A Correct.

Q And so you have no personal experience with EPA submitting labels with different language than the underlying language, is that right?

A That's correct.

Q And you told us that this is the common practice in the industry, is that right?

A Yes.

Q So you haven't talked to anyone else who has submitted a me-too label that is different from the underlying label, is

that right?

A That's right.

4/22/05 Hr. Tr. at 111–112.

Finally, Mr. Blake candidly stated that he would not know how to redraft the Bifen I/T label to receive expedited review. *See* 4/22/05 Hr. Tr. at 103.

[Ms. Fletman:] Now, I just want to make sure that I understood you. Did you say, Mr. Blake, that you didn't know how you could rewrite the [Bifen I/T] label to be different from the FMC label and still get EPA approval, is that right?

A Yes, ma'am. Expedited review is what I was specifically talking to.

Q Okay. Well, let me—do you know how you could rewrite the [Bifen I/T] label and submit it for EPA approval and not get expedited review?

A Yes, ma'am. I'm not sure if I could write it substantially different.

Q Okay. Well . . .

A Or I'll say different enough.

Q Different enough?

A To satisfy the wishes of the opponent.

4/22/05 Hr. Tr. at 126–127 (emphasis added).

However, FMC presented as evidence examples of labels that had been both redrafted and approved by the EPA, apparently with an expedited result. *See generally*, 4/22/05 Hr. Tr. at 127–33.[17]

As indicated above, on March 4, 2005, FMC delivered a cease and desist letter to CSI. Declaration of Kelly Dobbs Bunting ("Bunting Decl.") ¶ 2 (Ex. J to Motion for TRO); Letter, dated March 3, 2005 (Ex. F to Motion for TRO). The letter informed CSI's CEO Boyd that a comparison of the Bifen I/T and TalstarOne labels demonstrated that CSI had copied FMC's label. *See id.* FMC advised Mr. Boyd that FMC's label was copyrighted, demanded that CSI stop all further sales of the product using the infringing Bifen I/T label and requested that CSI provide to FMC a plan that would result in recall of all infringing product not already in the hands of an end-user. *Id.* CSI received the cease and desist letter. Bunting Decl. ¶ 3; Federal Express receipt (Ex. G to Motion for TRO). CSI did not respond within the 10–day time limit set forth in FMC's cease and desist letter. Bunting Decl. ¶ 4. Thereafter, on March 28, 2005, CSI advised FMC it had hired counsel. Bunting Decl. ¶ 5. Counsel for CSI rejected FMC's infringement claims concerning its copyrighted TalstarOne product label. Bunting Decl. ¶ 6. CSI continues to market Bifen I/T with the allegedly infringing label. Froelich Decl. ¶ 29. Moreover, CSI has granted two sub-registrations for the infringing Bifen I/T label. *See, e.g.*, Press Release, dated March 26, 2005 (Ex. A to

**17.** During the cross-examination of CSI's Mr. Blake, FMC used Exs. P–67 and 69 (the AgValue PoaConstrictor labels) to demonstrate that a generic company like AgValue could change the label for a me-too product and obtain expedited EPA approval within 90 days. *See also*, P–68 (the underlying Bayer Prograss label, on which the PoaConstrictor label is based). Further comparison of the two Poa-Constrictor labels reveals that many more changes than those detailed during the preliminary injunction hearing were made. *Compare, e.g.*, P–67 and P–69 sections entitled "General Information", "Spray Equipment", "Application and Precaution", "Varietal Tolerance", "General Recommendations", "Recommended Rates" and "Timing Chart" *with* Ex. P–68.

Froelich Decl.); (Ex. B to Froelich Decl.) (copy of the Firebird LCO label). The sub-registrant's label is also nearly identical to FMC's TalstarOne label.

On April 5, 2005, FMC filed its Complaint alleging copyright infringement and false designation of origin.

### III. LEGAL ANALYSIS

FMC seeks a preliminary injunction to immediately enjoin CSI from continuing to duplicate FMC's label, placing the infringing label in the stream of commerce and facilitating the sale of any product that utilizes an infringing label.

As described above, CSI began distributing its generic brand of pesticide containing bifenthrin, Bifen I/T, more than five years after FMC's patent on bifenthrin expired. Bifen I/T contains the exact ingredients, in the identical proportions as, and is thus functionally equivalent to, FMC's TalstarOne product. CSI's Bifen I/T label was prepared and submitted to the EPA as part of a me-too submission.[18] For an expedited review, the EPA requires that labels for me-too submissions contain significantly similar content as those labels for the existing registrations for products with identical ingredients and proportions on which the generic me-too products are based.

CSI alleges that it is a common practice for those seeking registration of generic pesticide products to engage in essentially verbatim copying of the content of labels for earlier-registered proprietary (or counterpart) pesticides on which the generic product is based. CSI suggests that such outright copying is what EPA requests and expects in evaluating applications to register generic products for sale.[19]

CSI raises many affirmative defenses to FMC's establishment of a *prima facie* case of copyright infringement. On the record established thus far, however, none of these affirmative defenses is so persuasive as to undermine what appears as FMC's likely success with its claim. CSI contends that any label's purpose, as dictated by the EPA, is purely functional. FMC counters that, while a portion of the label

18. CSI sought and obtained a me-too registration based on an application for a "straight re-pack" of Talstar TC Flowable. To receive an expedited review of the generic product, CSI initially represented to the EPA that it was planning to execute a mere re-pack of FMC's "Talstar" product in containers bearing the Bifen I/T name and labels. *See* P–24 (Letter dated Apr. 1, 2003 from Joe Blake, Director of Regulatory Affairs, Control Solutions, to the EPA with attachments including Confidential Statement of Formula). However, as set out in greater detail at footnote 4, *supra*, Mr. Blake testified that he did not know whether CSI ever in fact re-packed any TalstarOne into Bifen I/T. FMC contends that it has never sold TalstarOne or bifenthrin to CSI, and CSI produced no evidence to refute FMC's statement. *See* 4/21/05 Hr. Tr. at 44; Ex. D–12, letter from Lawrence A. Miller, Consultant to CSI, to David B. Weinberg, Esq., outside counsel to FMC, dated March 1, 2004 ("You are correct that CSI does not

purchase its bifenthrin from FMC ..."). Mr. Blake further testified that CSI currently purchases bifenthrin from some other source and formulates it into Bifen I/T.

This series of events and representations is pertinent because the EPA gives less exacting scrutiny, and thus quicker approvals, to the registration of re-pack products than it does to those formulated by another non-re-pack me-too registrant. 4/22/05 Hr. Tr. at 17–19; 21–24. Therefore, on the present record, CSI may have presented inaccurate facts to the EPA regarding its product launch in order to achieve approval for its Bifen I/T market launch as quickly as possible.

19. In fact, contrary to CSI's suggestion and as discussed *infra*, the applicable statutes and EPA regulations promulgated thereunder do not mandate labels that are, for all intents and purposes, verbatim or nearly wholesale copies of the label on which the generic product is based.

contains mandated facts and functional information, much of the label evidences independent creativity, including language, usage and layout consistent with assessments by FMC's marketing department. Nonetheless, CSI argues that its copying of the label is protected by the fair use doctrine and, alternatively, that FMC may not receive the benefits of copyright protection because FMC's claim of copyright infringement is nothing more than copyright misuse, that is, an attempt by FMC to inequitably and unlawfully extend its previous legal monopoly on a bifenthrin-based pesticide beyond the termination of the prior patent. Thus, CSI contends that FMC comes to this Court with unclean hands. However, no evidence exists within this record to raise the specter of any improper motive by FMC in its attempt to protect its legitimate legal rights or maintain equitable, lawful competition with regard to the protectible intellectual property contained within its product labels.

In sum, at this time and on the present record, the Court finds that it is sufficiently likely that FMC will succeed on the merits of its claim and that the other necessary elements for issuance of a preliminary injunction are met.

### A. Standard of Review

An injunction is an extraordinary measure, and this Court recognizes that judicial analysis of the issues presented here demand considerable seriousness of purpose. *See U.S. v. Oakland Cannabis Buyers' Co-op.,* 532 U.S. 483, 498, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001). In fact, the issues and arguments require that the Court proceed with an abundance of caution and look at no facts in isolation.

■ The standards for issuing a preliminary injunction are the same as those for issuance of a temporary restraining order. *Ride the Ducks, L.L.C. v. Duck Boat*

*Tours, Inc.,* 2005 WL 670302 (E.D.Pa. Mar.21, 2005) (citing *Bieros v. Police Chief Nicola,* 857 F.Supp. 445, 446 (E.D.Pa. 1994)); *see also, Nutrasweet Co. v. Vit-Mar Enterprises, Inc.,* 112 F.3d 689, 692–93 (3d Cir.1997). The party seeking a preliminary injunction in a copyright action must convince the Court that, on balance, the following factors, when applied to the facts and weighed in conjunction to each other, favor granting preliminary injunctive relief:

(1) the likelihood that the moving party will succeed on the merits;

(2) the extent to which the moving party will suffer irreparable harm without injunctive relief;

(3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and

(4) the public interest.

*See Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.,* 342 F.3d 191(3d Cir.2003); *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.,* 290 F.3d 578, 586 (3d Cir.2002) (citing *Clean Ocean Action v. York,* 57 F.3d 328, 331 (3d Cir.1995); *Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 879 (3d Cir.1997)); *Impax Laboratories, Inc. v. Aventis Pharmaceuticals, Inc.,* 235 F.Supp.2d 390 (D.Del.2002); *Merrill Lynch v. Napolitano,* 85 F.Supp.2d 491, 496 (E.D.Pa.2000). A district court should attempt to "balance[ ] these four ... factors to determine if an injunction should issue." *Am. Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ.,* 84 F.3d 1471, 1477 n. 2 (3d Cir.1996) (en banc). As explained below, in this case as presented by the parties thus far, each of these factors weighs in FMC's favor.

■ The Court of Appeals for the Third Circuit has recognized that "[i]t is not

necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking [injunctive] relief to make a prima facie case showing a reasonable probability that it will prevail on the merits." *Oburn v. Shapp,* 521 F.2d 142, 148 (3d Cir.1975); *see also Acierno v. New Castle County,* 40 F.3d 645, 653 (3d Cir. 1994). " 'Reasonable' probability is used in the opinions interchangeably with 'substantial' likelihood of success." *Gucci Am., Inc. v. Daffy's, Inc.,* 2000 WL 1720738, at *7 (D.N.J. Nov. 14, 2000) (citing *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir. 1989)). " 'Probability of success' implies that the moving party, usually the plaintiff, must have a very clear and strong case." 5 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition,* 30:45 (4th ed.2004). After consideration of the evidence and governing case law, the Court concludes that FMC has such a "very clear and strong case."

### B. The Copyright Act of 1976, As Amended

Copyright law protects "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102. Subject to certain enumerated exceptions within the Copyright Act, copyright owners have the exclusive right to do and to authorize: (1) reproduction of the copyrighted work in copies; (2) prepare derivative works, and (3) distribute copies. 17 U.S.C. § 106.

■ To establish a *prima facie* case of copyright infringement for preliminary injunction purposes, FMC needed to show that CSI's wholesale copying of its label likely violates any provision of § 106. *See* 17 U.S.C. § 501(a), (b). The statute, in pertinent part, states:

(a) Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 ..., is an infringer of the copyright.

. . . . .

(b) The legal or beneficial owner of an exclusive right under a copyright is entitled ... to institute an action for any infringement of that particular right committed while he or she is the owner of it.

17 U.S.C. § 501(a), (b). An established copyright prohibits unauthorized copying to the extent copies are, at a minimum, substantially similar to the copyrighted work. *See Educational Testing Svcs. v. Katzman,* 793 F.2d 533, 541 (3d Cir.1986).

■■ To prove copyright infringement pursuant to 17 U.S.C. § 501, the plaintiff must demonstrate two elements: (1) ownership of a copyright and (2) copying by the defendant. *Dam Things from Denmark v. Russ Berrie & Co., Inc.,* 290 F.3d 548, 561 (3d Cir.2002); *Whelan Associates, Inc. v. Jaslow Dental Lab., Inc.,* 797 F.2d 1222, 1231 (3d Cir.1986). The copying element is proven by demonstrating "not only that the defendant had access to a copyrighted work, but also that there are substantial similarities between the two works." *Id.See also, Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 291 (3d Cir.1991) ("[c]opying is demonstrated when someone who has access to a copyrighted work uses material substantially similar to the copyrighted work in a manner which interferes with a right protected by 17 U.S.C. § 106.") In this case, there is no dispute that CSI copied the FMC label. Verbatim copying is admitted. What is at issue, however, is CSI's argument that for one reason or another, it was entitled to copy and use the FMC material with impunity.

### C. EPA Legislation and Regulations

The Federal Insecticide, Fungicide and Rodenticide Act is the comprehensive stat-

utory scheme which governs the registration of pesticide products manufactured or offered for sale in the United States. As a central part of the registration process, there are requirements governing the data that must be provided by original and subsequent applicants for pesticide registrations. *See* 7 U.S.C. § 136a(c)(2). Specific labeling requirements also must be satisfied.[20] *See* 7 U.S.C. § 136p. The EPA is required to act "as expeditiously as possible" on any application for registration of a pesticide which

> proposes the initial or amended registration of an end-use pesticide that, if registered as proposed, would be identical or substantially similar in composition and labeling to a currently-registered pesticide identified in the application, or that would differ in composition and labeling from such currently-registered pesticide only in ways that would not significantly increase the risk of unreasonable adverse effects on the environment[.]

*See* 7 U.S.C. § 136a(c)(3)(B)(i)(I).[21]

FIFRA identifies unlawful acts, including the sale of any pesticides not registered under its provisions and the use of any pesticide "in a manner inconsistent with its labeling." 7 U.S.C. § 136j(a)(1)(A) and (G). FIFRA establishes civil and criminal penalties for violations. 7 U.S.C. § 136l. The EPA is also authorized to prescribe regulations to carry out FIFRA's provisions. 7 U.S.C. § 136w. Pursuant to that authority, the EPA has developed an extensive regulatory framework for the registration of pesticide products, including those regulations set forth in 40 C.F.R. §§ 152, *et. seq.*

The *EPA Label Review Manual* (3d ed.2003) describes the review process for labels submitted by applicants and includes comprehensive instructions for agency review and approval of labels. The purpose of the registration and label review process is to "produce labels that are clear [and] correctly direct users in how to use the product." 4/22/05 Hr. Tr. at 54; *accord,* 4/22/05 Hr. Tr. at 157 (testimony by CSI's expert, Mr. Schatzow). The *EPA Label Review Manual* complements guidelines issued by the EPA that provide additional explanation regarding certain label requirements and the label review process.[22]

A product such as CSI's Bifen I/T is referred to, in the vernacular of FIFRA guidance, as a me-too product. The EPA defines a me-too product as "an application for the registration of a pesticide product that is substantially similar or identical in

---

**20.** There is no dispute that the product being registered with the EPA is not just the pesticide/terrmiticide, but the label is also deemed a necessary and vital part of the registration. *See* 4/21/05 Hr. Tr. at 43; 4/22/05 Hr. Tr. at 5. FMC's expert, Mr. Tinsworth, testified:

> ... So when EPA issues the registration, they're issuing a registration that covers both the pesticide and its labeling.... The registration is basically the license that allows the pesticide to be sold and distributed. Without the registration you can't—you can't sell the pesticide product.

4/22/05 Hr. Tr. at 5.

**21.** The Court has neither discovered, nor have either of the parties submitted evidence from which the Court could conclude, that the EPA established an opinion or protocol consistent with either of the parties' positions in the instant matter with respect to the handling of various categories of submissions to the EPA. Thus, the Court must look to the plain words of the applicable *statutes* and *regulations* while bearing in mind the contemporaneous request for copyright protection. Nothing in the statutory or regulatory provisions expressly applicable to this product (as opposed to other products discussed as a comparison scheme, *infra* ) requires, mandates or excuses unauthorized copying of a competitor's product label.

**22.** *See generally,* http://www.epa. gov/opp-fead1/ labeling/lrm (last visited May 15, 2005).

its uses and formulation to products that are currently registered." *See* "General Information on Applying for Registration of Pesticides in the United States." EPA, August 1992, Glossary, G–16. With regard to me-too applications, the EPA is required to complete review of such applications within 90 days. 7 U.S.C. § 136a(c)(3)(B)(ii)(II). Furthermore, EPA Form 8570–1 ("Application for Pesticide Registration or Amendment"), which must be submitted by applicants for me-too registrations, contains the following required statement with respect to such expedited review:

> In accordance with FIFRA Section 3(c)(3)(B)(I), my product is similar or identical in composition and labeling to: [product number and name].[23]

The *EPA Label Review Manual,* consistent with the EPA regulations, 40 C.F.R. § 156, sets forth specific requirements for language that must appear on an applicant's label. For example, an applicant is required to list: (1) specific warning language based on the product's toxicity; (2) the sites of application (i.e. crops); (3) the target pests; (4) the dosage rate associated with each site and pest; (5) the method of application; and (6) the frequency and timing of application. *See* 40 C.F.R. § 156.10(I).[24] The basic directions for label review by the EPA undermine CSI's contention that near-verbatim copying is necessary to achieve expedited review for a me-too product. Reviewers are specifically warned *against* limiting themselves

to a label-to-label comparison but "must review a label based on the applicable law and guidance." *See* EPA Label Review Manual, Ch. 1, at 2, III, B:

> This manual provides a systematic approach to the label review process. Most label reviews involve products that make reference to another label and which are not accompanied by data. When reviewers compare new proposed labels to previously registered labels, the existing registered label may have errors or be out of date. If the existing label has deficiencies, the proposed label may bear the same errors. **Consequently, label reviewers must not rely solely on a label to label comparison, but must review a label based on applicable law and guidance.**

*See also,* 4/22/05 Hr. Tr. at 72–73 (emphasis added).

For pesticides with multiple use sites and different methods of application and application rates, the respective products' "directions for use" may be many pages long and are often attached to the pesticide container in booklet form. The regulated disclosures are intended to provide the required information "stated in terms which can be easily read and understood by the average person likely to use or to supervise the use of the pesticide." *See* 40 C.F.R. § 156.10(i)(1)(I).

CSI contends that both the statute and the EPA guidance contemplate that the label of a me-too product will be essentially the same as that of the already-regis-

---

**23.** Consistent with the protections provided by copyright law, to achieve fast track registration, generic pesticide producers would be best served by either (a) paraphrasing the label from the pioneer product to create a substantially similar label or (b) negotiating and contracting with the pioneer producer to use nearly verbatim language from the original label. The language on Form 8570–1 forecloses neither option.

**24.** FMC's expert, Mr. Tinsworth, also testified, based on his experience and upon his review of the EPA Label Review Manual, that there is a clear indication that the EPA is "willing to look at language that would actually improve the message to the user of the product." 4/22/05 Hr. Tr. at 68–69.

tered product. However, CSI produced, and this Court has found, no evidence, statute or regulation that permits or authorizes such direct infringement or plagiarism. Nor is there any indication within the applicable statutes and regulations to provide support for CSI's proposition that copyright law is to be preempted in the context of consumer or commercial product labels. CSI's argument, taken to its logical conclusion, would even discourage consumer and commercial manufacturers from updating their labels. Specifically, with respect to me-too submissions, Chapter 11 of the *EPA Label Review Manual* provides:

> If the application is a me-too submission ..., reviewing the directions for use is fairly straightforward: The label reviewer should make a side-by-side comparison of the proposed set of use directions to the use directions on the label for the registered product(s) which are identified in the me-too application.[25]

CSI does not go so far as to argue that this directive is designed to assure (and, thereby, require) copying. However, despite this requirement for a comparison, CSI does claim that requiring independent creation of product labels would result in very significant consequences for the applicants, the EPA, and the users of pesticide products. Without any support for its proposition, and perhaps because CSI has never in fact attempted to independently create a product label, CSI surmises that applicants likely would be forced by the EPA back to using the exact form of wording as is in the already registered label. *See* 4/22/05 Hr. Tr. at 103–117, 136–40. CSI also makes much of its stated concern that the EPA would be required to utilize

significant additional resources to review me-too labels to compare language that is different from the original label or is possibly presented at different places on the label. Thus, CSI states it is concerned that the EPA would be required constantly to determine whether the alternative language has the same meaning as the language originally approved by EPA for the pioneer product.

Without a doubt, checking two documents merely to determine whether they are identical is not difficult. That is not the task assigned to the EPA reviewing staff, and this Court has more faith and confidence in the EPA's abilities. There is simply insufficient reason to doubt that EPA personnel have the requisite education, skill and experience in their respective fields to determine, consistent with Chapter 11 of the *EPA Label Review Manual,* by a side-to-side comparison, whether the language in purportedly similar labels has the same import.

Finally, CSI argues that under the type of drafting that FMC claims is appropriate and consistent with copyright law, expedited EPA review would become an impossibility. However, CSI's argument is flawed, considering the evidentiary showing by FMC that, in fact, the EPA has been able to comply with the regulatory expedited time requirements when approving a me-too label application that consisted of language drafted to merely be substantially—and substantively—similar without being a near-verbatim copy. *See generally,* Exs. P–67 and P–69 (the generic AgValue PoaConstrictor product labels) and P–68 (the original Bayer Prograss product label).

---

**25.** If the process was as cursory and mechanical as CSI contends, such a side-by-side comparison would be unnecessary and could merely be replaced with a check-box that the me-too filer merely checked to indicate that it had copied the original label, replacing the former product name with the new one.

CSI's Director for Regulatory Affairs, testified essentially that CSI copied FMC's label because CSI desired quicker entry and distribution into the bifenthrin-based pesticide market than it could enjoy if CSI took the time and expended effort to create its own label and submit it for EPA approval. This is a candid explanation of CSI's motives, but candor does not make up for the fact that it is not a valid or legal defense to copyright infringement.

As discussed above, nothing in the applicable regulations requires CSI to use the same label language as FMC. *See* 40 C.F.R. § 156.10. To the contrary, the regulations addressing the labeling requirements for pesticides provide significant latitude to determine the content and placement of product label language. For example, the provisions concerning "directions for use" require only that the label be drafted with plain language that is easily understood:

(i) Directions for Use—(1) General Requirements—(i) Adequacy and clarity of directions. Directions for use must be stated in terms which can be easily read and understood by the average person likely to use or to supervise the use of the pesticide. When followed, directions must be adequate to protect the public from fraud and personal injury or to prevent unreasonable adverse effects on the environment.

(ii) Placement of directions for use. Directions may appear on any portion of the label provided that they are conspicuous enough to be easily read by the user of the pesticide product. Directions for use may appear on printed **or** graphic matter which accompanies the pesticide. . . .

40 C.F.R. § 156.10(a). Nothing in the regulations regarding me-too applications requires verbatim copying of the original label. *See* 40 C.F.R. §§ 152.85 and 152.113(b).

Moreover, the *EPA Label Review Manual,* including the relevant EPA Pesticide Registration Notices (the "PR Notices") available as updates on the EPA website, have advised registrants to develop their own language for product labels. *See* Ex. P–50 (*EPA Label Review Manual*); Ex. P–51 (PR Notices) ("**Registrants should develop language of their own which follows the above guidelines** . . ." PR Notice 96–7 at 15; "[t]he Agency **encourages the development of information and label provisions** regarding the efficacy of such treatments . . ." *Id.* at 19; "Specific storage instructions **are not** prescribed." PR Notice 83–3 at 2) (emphasis added). Furthermore, FMC correctly argues that, while the *EPA Label Review Manual* requires that "[f]or me-too submissions, the pesticide product and the proposed use must be identical or substantially similar to a currently registered pesticide," it does not require the pesticide label to be identical or substantially similar. Ex. P–50, *EPA Label Review Manual,* at 4–3. Not even a specific layout for the "directions for use" are mandated: "**The format** for the presentation of use information on the me-too label **need not be identical** to the format on the registered (cited) label as long as the critical information as described above remains the same and the me-too product meets applicable legal requirements on labeling." *Id.* at 11–3 (emphasis added). The *EPA Label Review Manual* also offers examples of labels that may be partially filled-in for registrants to add necessary language, and further instructs that the EPA reviewer will look at each label to "make a case-by-case determination on the acceptability of label language." *Id.* at Chapter 3, Sample Label Formats and 11–3.

Finally, regardless of the Court's interpretation of the statutory and regulatory

language that supports FMC's request for a preliminary injunction, as explained above, FMC has also made a persuasive evidentiary showing that verbatim or nearly wholesale copying of another registrant's label is unnecessary to obtain expedited review by the EPA of a label.

### D. Preliminary Injunction Analysis and Discussion

#### 1. Establishing a Prima Facie Case of Copyright Infringement

#### (a) The Copyright Umbrella

 FMC's copyright claim involves many of the underlying tenets of intellectual property rights. Pursuant to Article I, Section 8 of the Constitution, Congress is empowered to enact laws "To Promote the Progress of Science and useful Arts, by securing for a limited Time to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." Pursuant to 35 U.S.C. § 101, et seq. ("Inventions patentable"), inventors or discoverers of new and useful compositions of matter, such as bifenthrin, are given an exclusive right to their invention or discovery for a period of years after which the invention or discovery and its teachings

inure to the benefit of the public. Under the Copyright Act of 1976, 17 U.S.C. § 101, et seq., the creators of "original works of authorship" may claim the benefit of statutory protection. § 102.[26] Proprietors of compilations or derivative works, such as the labels at issue, are entitled to a valid copyright in such works. See 17 U.S.C. § 103. The concepts or ideas set forth in works of authorship, without more, are not protectible by copyright. See Baker v. Selden, 101 U.S. 99, 11 Otto 99, 25 L.Ed. 841 (1879); 17 U.S.C. § 102(b). Likewise, purely factual information is beyond the scope of copyright protection. Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). "[R]aw facts may be copied at will." Feist Publications, Inc. v. Rural Telephone Service Co., Inc., 499 U.S. 340, 350, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). The so-called "sweat of the brow" doctrine has been repudiated, and Section 102(b) was included within the Copyright Act of 1976 to emphasize that no copyright may be attained for factual information. Id. at 356, 111 S.Ct. 1282.[27]

#### (b) The Originality Requirement

██ Originality is the *sine qua non* of a copyright. *Id.* A work must be original

---

**26.** Section 102 provides, in pertinent part:

(a) Copyright protection subsists ... in original works of authorship fixed in any tangible medium of expression ... [including] ...

(1) literary works[.]

(b) In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

**27.** In *Feist,* the Supreme Court summarized:

the 1976 revisions to the Copyright Act leave no doubt that originality, not "sweat of the brow," is the touchstone of copyright

protection in directories and other fact-based works. Nor is there any doubt that the same was true under the 1909 Act. The 1976 revisions were a direct response to the Copyright Office's concern that many lower courts had misconstrued this basic principle, and Congress emphasized repeatedly that the purpose of the revisions was to clarify, not change, existing law. The revisions explain with painstaking clarity that copyright requires originality, § 102(a); that facts are never original, § 102(b); that the copyright in a compilation does not extend to the facts it contains, § 103(b); and that a compilation is copyrightable only to the extent that it features an original selection, coordination, or arrangement, § 101.

*Id.* at 360, 111 S.Ct. 1282.

to its author for the work to qualify or be entitled to copyright protection. *Id.* (citing *Harper & Row,* 471 U.S. at 547–49, 105 S.Ct. 2218). "Original" means that

> the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. 1 M. Nimmer & D. Nimmer, Copyright §§ 2.01[A], [B] (1990) (hereinafter Nimmer). To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, "no matter how crude, humble or obvious" it might be. *Id.,* § 1.08[C][1]. Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.

*Feist,* 499 U.S. at 345, 111 S.Ct. 1282; *see also, Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1369–70 (5th Cir.1981) ("Copyright protection does not extend to the facts themselves, and the mere use of information contained in a directory without substantial copying of the format does not constitute infringement."). Originality is also a constitutional necessity requiring "independent creation plus a modicum of creativity." *Id.* at 346, 111 S.Ct. 1282 (citing *The Trade–Mark Cases,* 100 U.S. 82, 94, 10 Otto 82, 25 L.Ed. 550 (1879)). Protected writings are the result of "the fruits of intellectual labor." *Id.* Moreover, nothing in the copyright statute "support[s] the argument that the intended use or use in industry of an article eligible for copyright bars or invalidates its registration." *Mazer v. Stein,* 347 U.S. 201, 218, 74 S.Ct. 460, 98 L.Ed. 630 (1954). The Supreme Court

has explicitly refused to read such a limitation into the copyright law. *Id.*

██ In essence, CSI contends that regulated commercial product labels are *per se* excluded from copyright protection under the express terms of Section 102(b) of the Copyright Act and consistent with the precedent and principles underlying *Baker v. Selden,* 101 U.S. 99, 11 Otto 99, 25 L.Ed. 841 (1879). However, just as the *Baker* plaintiff could not secure a copyright in bookkeeping system, this Court is not holding that FMC has a copyright or any other intellectual property protection for the system of pesticide application. Nevertheless, just as the *Baker* plaintiff was entitled to copyright protection for its forms and description on how to do bookkeeping, FMC's description of how to most effectively use TalstarOne is the proper subject of a copyright. *See Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1250. "[FMC] does not seek to copyright the method which instructs the [user] to perform its [extermination] functions but only the [unregulated text of] instructions themselves." *See id.* at 1251. This Court finds no reason to afford any less copyright protection to the partially regulated instructions on a commercial product label than to the instructions on a non-regulated or regulated consumer product label. *See id.* Stated otherwise, weak copyright is still a valid copyright, entitled to protection and, when applicable, injunctive relief.

### (c) Compilations and Originality

In *Feist,* the Supreme Court analyzed and explained two well-established propositions in copyright jurisprudence: (1) facts are not copyrightable and (2) compilations of facts generally are. 499 U.S. at 344, 111 S.Ct. 1282.[28] The *Feist* Court

---

28. "Compilation" is defined in § 101 of the Copyright Act as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting

explained that the distinction between facts and factual compilations involves an understanding of the dichotomy between creation and discovery. *Id.* at 347, 111 S.Ct. 1282. Moreover, the Supreme Court emphasized that "[e]ach of these propositions possesses an impeccable pedigree." *Id.* at 344, 111 S.Ct. 1282. Furthermore, the Supreme Court also noted that "it is beyond dispute that compilations of facts are within the subject matter of copyright. Compilations were expressly mentioned in the Copyright Act of 1909 and again in the Copyright Act of 1976." *Id.* at 345, 111 S.Ct. 1282.

### (d) Purely Factual Information Protectible If Compilation Created With A Modicum of Creativity

 Factual compilations can possess the requisite originality to be afforded copyright protection.

The compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers. These **choices as to selection and arrangement,** so long as they are **made independently by the compiler and entail a minimal degree of creativity, are sufficiently original** that Congress may protect such compilations through the copyright laws. Nimmer §§ 2.11[D], 3.03; Denicola 523, n. 38. Thus, even a directory that contains absolutely no protectible written expression, only facts, meets the constitutional minimum for copyright

protection if it features an original selection or arrangement. *See Harper & Row,* 471 U.S. at 547, 105 S.Ct. at 2223. *Accord,* Nimmer § 3.03.

*Feist,* 499 U.S. at 348, 111 S.Ct. 1282 (emphasis added). The originality requirement for a copyright "is not particularly stringent" and no novelty is required. *Id.* at 358, 111 S.Ct. 1282. Rather, "[o]riginality requires only that the author make the selection or arrangement independently (*i.e.,* without copying that selection or arrangement from another work), and that it display some minimal level of creativity." *Id.* Thus, "the vast majority of compilations will pass this test, but not all will. There remains a narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent." *Id.* at 358–59, 111 S.Ct. 1282. While case law explains that the alphabetized white pages of a phonebook is such an example, little other guidance has been provided. *See Feist,* generally. To this Court, however, FMC's choice of language and layout for the non-mandated portions of the TalstarOne label would not fall into this "utterly-lacking-spark" category, as the Court finds that not only does a non-trivial creative spark exist consistent with the protections provided by the Copyright Act, but within the non-regulated content of the TalstarOne label there is a significant amount of material that FMC objectively and subjectively believes is specifically drafted to market to and assist current and prospective customers.[29]

---

work as a whole constitutes an original work of authorship."

**29.** FMC's Froelich testified that creativity and marketing acumen is a vital part of the FMC approach to label drafting and, thus, product registration process:

[Ms. Fletman:] . . . Can you explain to us, please, how that harm—what harm has FMC suffered?

[Ms. Froelich:] Okay. The people at FMC have spent a lot of time doing the studies that are required for this product and the label, we've had many, many meetings and conference calls, e-mail exchanges, as I have described before, to put a great deal of effort into writing this label, and making sure that it is of

Here, even if FMC, as a compilation author, added no written expression,[30] "[t]he only conceivable expression is the manner in which [FMC] selected and arranged the facts. Thus, if the selection and arrangement are original, these elements of the work are eligible for copyright protection." *See Feist*, 499 U.S. at 349, 111 S.Ct. 1282.

The Supreme Court held that the copyright in a factual compilation may not necessarily be robust. *See id.* However, even if the Court finds that the copyright in a factual compilation may be weak or "thin", and notwithstanding a valid copyright in the FMC product label, CSI is permitted to use the purely factual material contained in FMC's labels to aid in preparing the labels for CSI's generic product, "so long as [CSI's] competing work does not feature the same selection and arrangement." *Id.* "[T]he very same facts and ideas may be divorced from the context imposed by the author, and restated or reshuffled by second comers, even if the author was the first to discover the facts or to propose the ideas." *Id.* (citing Ginsburg, *Creation and Commercial Value: Copyright Protection of Works of Information*, 90 COLUM.L.REV. 1865, 1868 (1990)). Here, FMC has never argued, and could not argue, that CSI could not use the TalstarOne label as the basis or starting point for the Bifen I/T label.

the very highest quality that it can be, which is what is—
it's what is expected by the distributors and our customers,
because they know that we have a very high reputation, and
our product is something that we stand behind, and that they
can stand behind when they use it.
So the fact that Control Solutions has simply taken
our label and copied it, and then has started, you know,
using it that way, you know, it's something that, you know,
we feel strongly about, that it was ours, and we worked very
hard to produce it.
And the people in the field know FMC, they know our
product, and we stand behind it always.
4/21/05 Hr. Tr. at 44;
[Ms. Froelich:] I meant that the language on the label, we wanted it to
accurately reflect what was required by EPA's label manual
and any P.R. notices that were application, and to also be
assured that the language that we were drafting under
directions for use was something that was accurate, that
would support the claims on the label for control of
whichever pest it was, whether it was termites or general
household pests or lawn and tree pests, and that it was
marketable language, so that our lawn care operators, our
pest control operators would understand it and know that it
was up to our high standards of quality.
4/21/05 Hr. Tr. at p. 52. Mr. Tinsworth, confirmed that skill and creativity are necessary tools for creating label language. *See* 4/22/05 Hr. Tr. at 69.

30. In fact, at this preliminary stage of the proceedings, the Court received testimonial and documentary evidence that FMC included creative and expressive elements to its product label, even if such expressive elements would not qualify as being literary. Rather, the creative and expressive elements on the TalstarOne label could be original written expression, especially with regard to the marketing audience for a commercial or industrial product. Furthermore, such protection fulfills the objective of copyright, "not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.'" *Id.* at 349 (*quoting* U.S. Const. Art. I, § 8, cl. 8); *accord, Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975).

Paraphrasing is permitted.[31] The EPA guidelines even suggest such a derivative

---

31. FMC made a persuasive showing that paraphrased language for the label segments that are not required or mandated by the EPA can be used and the use of such language will not alter the eligibility to receive fast-track review for a me-too product:

BY MS. FLETMAN:

Q Okay, and again you looked at the TalstarOne label?

[Mr. Tinsworth:] Yes, I did.

Q And you looked at the [Bifen I/T] label?

A Yes.

Q And you reviewed the color coded label?

A Yes, I did.

Q Okay. Do you have an opinion whether the language in revised P–8 that's color coded yellow is required by the EPA?

A **The specific wording is not required.** The category, for example, you have to have a category [dealing] with use directions **but you can write those directions the way you want to, as long as they get the message across as to how to use the product properly.**

Q **And what's the basis of that opinion?**

. . . . .

A **My experience at EPA, working as a consultant and reviewing the various documents that we've talked about, including the label manual.**

4/22/05 Hr. Tr. at 28 (emphasis added). Mr. Tinsworth also testified that CSI could have used different language and still received fast-track EPA approval:

Q Okay. Do you have an opinion, sir, **whether Control Solutions could have used language different from the yellow coded language in the TalstarOne label and gotten it approved by the EPA?**

. . . . .

A My opinion is that **they could have gotten the different label language approved by EPA.**

Q Okay. What's the basis of that opinion?

A The basis of the opinion again is what I think the basic guidance that's established by the agency for these type of submissions that there are certain areas where there's language that's basically pretty much pro forma, you've got to put it down. **In the label guidance,** for example, the label manual if you look at use directions **it's clear that it can be written in a different way, different ways,** and I've looked at labels comparing this, both the color coding that we're looking at is dealing with labels that deal with subterranean termite use. And I have looked at a number of different subterranean termite labels and, again, **using the use direction section as an example, they're all different.**

4/22/05 Hr. Tr. at 29–30 (emphasis added).

. . . . .

When you're dealing with EPA there's kind of **EPA speak. You tend to write in certain ways and you make your statements in certain ways.** They can still be different but it didn't-what you had drafted just didn't fit into the type of language that EPA would have found acceptable, in my opinion.

Q **Okay. Is there only one way to write EPA speak?**

A **No, no, there's clearly different ways.**

. . . . .

BY MS. FLETMAN:

Q Okay, let's talk about the expedited basis or fast track application. Do you have an opinion as to whether Control Solutions could have used language different from the yellow coded language in the TalstarOne label and gotten it approved by EPA on an expedited or fast track basis?

work. *See* Ex. P–50 at 15, 19.

FMC correctly contends that CSI is not permitted to "feature the same selection and arrangement" as FMC featured, yet CSI has admitted to doing exactly that. The FMC TalstarOne label is, at a minimum, a factual compilation that is eligible for copyright. CSI has so far failed to rebut FMC's showing that the TalstarOne label "features an original selection or arrangement of facts, [even if,] the copyright is limited to the particular selection or arrangement." *See Feist*, 499 U.S. at 350–51, 111 S.Ct. 1282.

A Yes.

Q What's your opinion?

A My opinion is that they very easily could have done that.

Q Okay. What's the basis of your opinion?

. . . . .

label as a me-too applicant, does that change your opinion in any way?

A No.

4/22/05 Hr. Tr. at 38, 41–42 (emphasis added). *See also,* 4/22/05 Hr. Tr. at 30–42, including Exs. P–64 (Bayer Tempo 2 TC pesticide product label) and P–65 (Syngenta Demon TC pesticide product label), for the proposition that competitors within the pyrethroid class of pesticide chemistry, of which bifenthrin is included, can use different label language and still receive EPA registration approval.

**32.** The expression/idea dichotomy was expressly recognized in Section 102(b), which precludes copyright for "any idea." *Apple Computer*, 714 F.2d at 1252. Section 102(b) of the Copyright Act was not intended to enlarge or contract the scope of copyright protection, but merely "to restate ... that the basic dichotomy between expression and idea remains unchanged." *Id.* (citations omitted).

### (e) Valid Copyright—The Idea/Expression Dichotomy

CSI challenges the copyright of regulated product labels relying on the line drawn between ideas and their expression.[32] Only expressions with at least a modicum of creativity are entitled to a copyrighted. *Baker v. Selden* remains a legal benchmark regarding the scope of copyright for its discussion in *Mazer v. Stein,*[33] where the Court stated, "[u]nlike a patent, a copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea-not the idea itself." *Apple Computer,* 714 F.2d at 1252 (citing 347 U.S. at 217, 74 S.Ct. at 470 (footnote omitted)).

**33.** Discussing the dichotomy between the protections provided by patents and copyrights, respectively, the *Mazer* Court held:

[copyright] protection is given only to the expression of the idea-not the idea itself. Thus, in *Baker v. Selden,* 101 U.S. 99, 11 Otto 99, 25 L.Ed. 841, the Court held that a copyrighted book on a peculiar system of bookkeeping was not infringed by a similar book using a similar plan which achieved similar results where the alleged infringer made a different arrangement of the columns and used different headings. The distinction is illustrated in *Fred Fisher, Inc. v. Dillingham,* 298 F. 145, 151 (S.D.N.Y. 1924), when the court speaks of two men, each a perfectionist, independently making maps of the same territory. Though the maps are identical each may obtain the exclusive right to make copies of his own particular map, and yet neither will infringe the other's copyright. Likewise a copyrighted directory is not infringed by a similar directory which is the product of independent work. The copyright protects originality rather than novelty or invention-conferring only 'the sole right of multiplying copies.' Absent copying there can be no infringement of copyright.

347 U.S. at 217–218, 74 S.Ct. 460 (internal footnotes and citations omitted). Thus, here, as in *Baker, Mazer* and *Apple Computer, infra,* FMC contends that CSI should think differently.

■ Copyrights protect originality, not novelty or invention. *Franklin Mint Corp. v. National Wildlife Art Exchange, Inc.,* 575 F.2d 62, 64 (3d Cir.), *cert. denied,* 439 U.S. 880, 99 S.Ct. 217, 58 L.Ed.2d 193 (1978). Of particular significance to the FMC–CSI dispute,

> [j]ust as a patent affords protection only to the means of reducing an inventive idea to practice, so the copyright law protects the means of expressing an idea; and it is as near the whole truth as generalization can usually reach that, if the same idea can be expressed in a plurality of totally different manners, a plurality of copyrights may result, and no infringement will exist.

*Id.* at 1253 (*quoting Dymow v. Bolton,* 11 F.2d 690, 691 (2d Cir.1926) (emphasis added)). Such a conclusion necessarily presumes that there is no infringement when there has been independent drafting of another version so that plurality results, while infringement can be found where, as here, there has been wholesale or verbatim copying.

**(f) *Apple Computer,* Near–Verbatim Copying, and a Plurality of Copyrights**

■ *Apple Computer, supra,* 714 F.2d 1240, is instructive for its holdings as well as its factual similarity to this case. In *Apple Computer,* the Court of Appeals for the Third Circuit found that the programs sold by Franklin

> were virtually identical with those covered by the [ ] Apple copyrights. The variations that did exist were minor, consisting merely of such things as deletion of reference to Apple or its copyright notice.

*Id.* at 1245. The following factual situation from *Apple Computer* is similar to the instant matter,

> Franklin did not dispute that it copied the Apple programs. Its witness admitted copying each of the works in suit from the Apple programs. Its factual defense was directed to its contention that it was not feasible for Franklin to write its own operating system programs.... Franklin's vice-president of engineering ... concluded that ... identical [copying] was necessary in order to ensure 100% compatibility with application programs created to run on the Apple computer. He admitted that he never attempted to rewrite Autostart ROM and conceded that some of the works in suit (*i.e.* Copy, Copy A, Master Create, and Hello) probably could have been rewritten by Franklin. Franklin made no attempt to rewrite any of the programs prior to the lawsuit except for Copy [but] was "in the process of redesigning" some of the Apple programs and that "[w]e had a fair degree of certainty that that would probably work." Apple introduced evidence that Franklin could have rewritten programs ... and that there are in existence operating programs written by third parties which are compatible with Apple II.
>
> Franklin's principal defense [was] its contention that the Apple operating system programs are not capable of copyright protection.

*Id.* at 1245.

Therefore, the threshold question here is whether the idea that is the subject of copyright is capable of various modes of expression. *See Dymow,* 11 F.2d at 691. If a label for a competing product can be written or created which performs the same function as FMC's label, then that label is an expression of the underlying idea and is itself copyrightable. *See id.* The *Apple Computer* court held that "[i]n essence, this inquiry is no different than that made to determine whether the ex-

pression and idea have merged, which has been stated to occur where there are no or few other ways of expressing a particular idea." *See, e.g., Morrissey v. Procter & Gamble Co.,* 379 F.2d 675, 678–79 (1st Cir.1967); *Freedman v. Grolier Enterprises, Inc.,* 179 U.S.P.Q. 476, 478 (S.D.N.Y. 1973) ("[c]opyright protection will not be given to a form of expression necessarily dictated by the underlying subject matter"). Here, evidence presented during the preliminary injunction hearing supports the conclusion that there are multiple means to express the non-regulated language contained within the FMC label. It seems entirely consistent with common sense that the language structure and selection used by FMC does not represent the only means of expression of the ideas described by that language. While a successful effort would likely require more than a well-thumbed thesaurus, the task is not so daunting as to chill or thwart legitimate competition as CSI suggests. In fact, CSI's expert testified that his company personnel could draft other language to represent the ideas on which FMC's label is based. *See* 4/22/05 Hr. Tr. at 167–68.

With regard to the merger doctrine espoused in *Apple Computer,* if other methods of expressing the idea (here, application of pesticide/termiticide) are not foreclosed as a practical matter, then there is no merger and the initial rendition is copyrightable, as is the subsequent non-identical version. Understandably, CSI may well wish to demonstrate to its potential customers that its product is identical in makeup and applications as TalstarOne, however, "that is a commercial and competitive objective which does not enter into the somewhat metaphysical issue of whether particular ideas and expressions have merged." *See Apple Computer,* 714 F.2d at 1253.

Therefore, for the reasons stated above, CSI's argument that regulated commercial product labels are *per se* not copyrightable is unpersuasive.

**(g) Distinguishing the TalstarOne Infringement from *Feist* and *Smith-Kline***

*(i) Feist*

The disagreement in the present matter is easily distinguished from the respective holdings and results in *Feist* and *Smith-Kline,* based on the applicable facts and laws with regard to each matter.

*Feist* involved Rural Telephone Service Company's allegation of infringement with regard to the "white pages" residential phone listings by Feist Publications, Inc. Rejecting a claim of copyright infringement, the Supreme Court stated:

> Rural's selection of listings **could not be more obvious:** It publishes the most **basic information**—name, town, and telephone number-about each person who applies to it for telephone service. This is "selection" of a sort, but it **lacks the modicum of creativity** necessary to transform mere selection into copyrightable expression. Rural expended **sufficient effort** to make the white pages directory useful, **but insufficient creativity** to make it original.
>
> . . . . .
>
> Rural did not truly "select" to publish the names and telephone numbers of its subscribers; rather, it was required to do so by the Kansas Corporation Commission as part of its monopoly franchise. *See* 737 F.Supp. at 612. Accordingly, one could plausibly conclude that this selection was dictated by state law, not by Rural.[34]

**34.** Here, FMC is not claiming (nor could it) any copyright protection for that portion of its

Nor can Rural claim originality in its coordination and arrangement of facts. The white pages do nothing more than list Rural's subscribers in alphabetical order. This arrangement may, technically speaking, owe its origin to Rural; ... But there is nothing remotely creative about arranging names alphabetically in a white pages directory. It is an age-old practice, firmly rooted in tradition and so commonplace that it has come to be expected as a matter of course.... It is not only unoriginal, it is practically inevitable. This time-honored tradition does not possess the minimal creative spark required by the Copyright Act and the Constitution.

. . . . .

As a constitutional matter, copyright protects only those constituent elements of a work that possess more than a de minimis quantum of creativity.... As a statutory matter, 17 U.S.C. § 101 does not afford protection from copying to a collection of facts that are selected, coordinated, and arranged in a way that utterly lacks originality. Given that some works must fail, we cannot imagine a more likely candidate. Indeed, were we to hold that Rural's white pages pass muster, it is hard to believe that any collection of facts could fail.

. . . . .

Because Rural's white pages lack the requisite originality, Feist's use of the listings cannot constitute infringement.

*Feist,* 499 U.S. at 362–63, 111 S.Ct. 1282 (emphasis added). Here, in contrast, the TalstarOne label provides a significant amount of useful language with regard to layout, information, description and instruction and meets the standard of providing originality that reflects more than *de minimis* or a modicum of creativity. FMC has shown that its drafting process comprised more than mere effort or "sweat of the brow." Furthermore, FMC's coordination and arrangement of facts is in no way as unoriginal or commonplace as the "practically inevitable" alphabetical ordering of the telephone white pages.

### (ii) SmithKline and the Hatch–Waxman Amendments

▆▆ *SmithKline* is similarly distinguishable because of the specifically-tailored regulatory scheme applicable in that case which *required* identical labeling for generic versions of pharmaceutical products and the FDA's strict interpretation of the law to require nearly verbatim copying by generic producers.[35] See *SmithKline Beecham Consumer Healthcare, LP. v. Watson Pharmaceuticals, Inc.,* 211 F.3d 21, 22 (2d Cir.2000). Here, unlike the statutory and regulatory scheme in *Smith-Kline,* the plain wording of the EPA labeling statutes and regulations do not mandate copying, but rather suggest generic companies draft their own language. *See* Ex. P–50 at 15, 19. Moreover, at the preliminary injunction hearing in the present case, there was no evidence from or on behalf of the EPA to advance the notion

label where the language is mandated by the EPA. Rather, it is the additional descriptive, explanatory, instructional and marketing language that FMC seeks to protect from unauthorized copying.

**35.** Generic drugs are identical to pioneer drugs that have previously obtained FDA ap-

proval. They can be marketed once the pioneer drug's patent protection and the Federal Food, Drug, and Cosmetic Act exclusivity periods expire. *See* H. Rep. No. 98–857, Part I, at 16 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2649; *see also,* 21 U.S.C. § 355(j)(2)(A)(vii).

that the EPA requires generic or me-too applicants to copy the label language from the pioneer pesticide product.

In *SmithKline*, Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., and Circa Pharmaceuticals, Inc. (collectively "Watson"), sought to obtain FDA approval to sell a competing generic nicotine gum product. They were directed by the FDA to submit and use labeling for their generic product that was almost identical to SmithKline's copyrighted guide and audio tape that accompanied its non-generic product. *Id.* The FDA reported to the district court that such a requirement is consistent with the Hatch–Waxman Amendments to the Federal Food, Drug and Cosmetic Act, *see* Drug Price Competition and Patent Term Restoration Act of 1984 § 101, 21 U.S.C. § 355(j) ("Hatch–Waxman Amendments").[36] Thus, consistent with the language of the Hatch–Waxman Amendments, and as a result of the FDA's insistence on a literal interpretation of the Hatch–Waxman Amendments, the Court of Appeals for the Second Circuit held that Hatch–Waxman Amendments require generic drug producers to engage in nearly identical copying of the original labeling as was approved by the FDA for, and is used by, the producer of the pioneer drug rather than requiring that the generic label and supporting materials be redrafted to be only substantially similar. *SmithKline*, 211 F.3d at 23.

While *SmithKline* does not dictate a similar result here, the facts and issues addressed by the *SmithKline* court are instructive. What makes the instant matter fundamentally different from *Smith-Kline*, is that the language of the Hatch–Waxman Amendments *required* near-verbatim copying and the FDA specifically informed the alleged infringer, Watson, and the district court in that case that, in no uncertain terms, the generic nicotine patch would not be approved if the language was not nearly identical, except for a name change.

In 1998, SmithKline registered a federal copyright for a guide and audiotape script for its Nicorette product. Upon the expiration for its exclusivity period for Nicorette, SmithKline registered a copyright for the words and music on the audiotape. Shortly thereafter, [Watson] obtained FDA approval for the OTC marketing of a generic version of nicotine gum intended to compete directly with Nicorette. To obtain that approval from the FDA, Watson had to comply with the requirement imposed by the Hatch–Waxman Amendments that "the labeling proposed for [its] new drug [be] the same as the labeling approved for" Nicorette. 21 U.S.C. § 355(j)(2)(A)(v); *see also* 21 C.F.R. § 314.127(a)(7) ("FDA will refuse to approve an abbreviated application for a new drug under section 505(j) of the act [if] ... [i]nformation submitted in the abbreviated new drug application is insufficient to show that the labeling proposed for the drug is the same as the labeling approved for the listed drug....."). Thus, Watson's generic nicotine gum was "accompanied by a

---

**36.** The *SmithKline* court provided further background:

> The Hatch–Waxman Amendments reflect the FDA's view that clinical retesting of generic drugs was "unnecessary and wasteful because the drug ha[d] already been determined to be safe and effective," as well as "unethical because it [would] require[ ] that some sick patients take placebos and

be denied treatment known to be effective." *Id.* Bypassing redundant human testing would also speed up FDA approval for generic entrants and thus introduce price competition more rapidly once the pioneer producer's patent and exclusivity periods expired.

*SmithKline*, 211 F.3d at 26.

user guide and audio tape that [we]re virtually identical to SmithKline's." *SmithKline I,* 63 F.Supp.2d at 469.

*Id.* at 23. The *SmithKline* court found substantial concerns triggered by the copyright laws, specifically with regard to 17 U.S.C. §§ 101, but only when the copyright issues were considered in isolation and without competing regard for the Hatch–Waxman Amendments. *See id.* at 25. The court found that

SmithKline's guide and tape are creative works in which it has a substantial investment, and they are integral to both the marketing and use of Nicorette. Watson's guide and tape are concededly in large part copies of SmithKline's copyrighted materials. Moreover, Watson intends to use the guide and tape in marketing a product in direct competition with SmithKline's gum. **Absent more, the propriety of a preliminary injunction would seem clear.**

*Id.* (emphasis added). Nevertheless, the court of appeals found that the infringement issue was necessarily straightforward and easily disposed of in light of the Hatch–Waxman Amendments that "**not only permit but required** producers of generic drugs to use the same labeling as was approved for, and used in, the sale of the pioneer drug, even if the label has been copyrighted." *Id.* (emphasis added). Thus, the FDA's requirement that SmithKline's materials be copied precluded and preempted SmithKline's copyright infringement action. *Id.*

The *SmithKline* court also addressed the inconsistencies and outright contradictions in applying the requirements of the Hatch–Waxman Amendments to copyrighted materials:

We are thus faced with a conflict between two statutes. The Hatch–Waxman Amendments require generic drug producers to use labeling that will in-

fringe upon copyrights in labels of pioneer drugs. The Copyright Act seems to prohibit such copying. However, applying the familiar canon that, where two laws are in conflict, courts should adopt the interpretation that preserves the principal purposes of each, *see, e.g., Zenith Elecs. Corp. v. Exzec, Inc.,* 182 F.3d 1340, 1347 (Fed.Cir.1999) ("Unless Congress clearly indicates which of two statutes is to prevail in event of conflict, our responsibility is to interpret and apply them 'in a way that preserves the purposes of both and fosters harmony between them.'" (*quoting Vornado Air Circulation Sys., Inc. v. Duracraft Corp.,* 58 F.3d 1498, 1507 (10th Cir. 1995))), the conflict is less stark and more easily resolved than it might seem.

*SmithKline,* 211 F.3d at 27–28 (footnote omitted). No such conflict between two statutes is presented by FMC's claim here, and the Court need not search for an interpretation preserving the principal purposes of both the EPA label-related statutes and regulations and the Copyright Act. *See id.; Zenith Elecs. Corp. v. Exzec, Inc.,* 182 F.3d 1340, 1347 (Fed.Cir.1999). This Court has not been presented with any credible argument or evidence to support CSI's proposition that the applicable statutes or regulations mandate copying. No personnel from the EPA's pesticide registration department appeared in this Court to suggest that CSI is correct when it argues that the EPA believes that the law requires verbatim or nearly verbatim copying of pesticide product labels to receive expedited me-too approval.

Nevertheless, this Court is mindful of, and sympathetic to, the cautionary concern expressed in *SmithKline* with regard to the risk that infringement actions involving commercial labels could be used in an attempt to harass competitor:

Although commercial labeling is clearly copyrightable, ... it has been recognized that the danger lurking in copyright protection for labels is that the tail threatens to wag the dog—proprietors at times seize on copyright protection for the label in order to leverage their thin copyright protection over the text ... on the label into a monopoly on the typically uncopyrightable product to which it is attached. Used in that fashion, the copyright serves primarily as a means of harassing competitors, and thus fails nine times out of ten. Here[,] although the labeling at issue is more creative than that in the "familiar" commercial labeling cases, SmithKline's copyright claim is arguably weaker than even the typical commercial labeling case, because the copyrighted text was submitted to obtain FDA approval and consequent market exclusivity.

*SmithKline*, 211 F.3d at 29 n. 5 (citations omitted). Nonetheless, FMC's resort to litigation does not raise the tail-wagging-the-dog specter here; nor does the evidence presented thus far expose FMC as using this litigation as a means of harassing CSI. FMC has made it plainly clear that generic competitors should merely be required to use language that is, at a minimum, paraphrased rather than using an identical text and layout. Such a position strikes the Court as basically reasonable and consistent with promotion of lawful competition.

In summary, the EPA regulations at issue in the instant matter do not dictate here a conclusion similar to that reached in *SmithKline* or *Feist.* Not only did CSI fail to present competent evidence to this Court that nearly identical copying of insecticide/termiticide labels is the standard operating procedure in the industry,[37] but, more significantly, the EPA regulations do not explicitly require copying of the original or pioneer label, and the applicable statutes and regulations here do not intimate such a result.

*2. Requesting a Preliminary Injunction Following the Establishment of a Prima Facie Case for Copyright Infringement*

**(a) Likelihood of Success—CSI Has Admitted Copying of FMC's Label**

To prove copyright infringement pursuant to 17 U.S.C. § 501, the plaintiff must demonstrate two elements: (1) ownership of a copyright and (2) copying by the defendant. *Dam Things*, 290 F.3d at 561; *Whelan Assocs.*, 797 F.2d at 1231. FMC is likely to succeed on the merits of its copyright infringement claim inasmuch as its evidence supports both necessary elements. First, FMC has established that it owns the copyright for its TalstarOne product labels. On February 17, 2005, FMC's registration of the copyrights became effective for the product labels of TalstarOne Multi–Insecticide (2003) and TalstarOne Multi–Insecticide (2004). *See* Ex. C to TRO.[38] Pursuant to

---

**37.** CSI failed to make a credible showing at this stage that it is "common practice" within the pesticide/termiticide industry to engage in verbatim or nearly verbatim copying of competitors' labels. *See* 4/21/05 Hr. Tr. at 99–100, 136. Regardless, such a showing would not be persuasive. Even if "everyone is doing it," for the reasons stated herein, such a practice is not equitable or lawful. Rampant disregard for legal requirements does not in and of

itself turn an illegal act into a legal one in this context.

**38.** Subsequently, during the preliminary injunction evidentiary hearing and oral argument, FMC provided the Court with corrected and updated versions of the registration certificates, representing that the certificates were re-filed to indicate that the TalstarOne labels are derivative works.

17 U.S.C. § 410(c), registration certificates constitute *"prima facie* evidence of the originality of the work and the facts stated in the certificates." *Chere Amie, Inc. v. Windstar Apparel, Corp.*, 191 F.Supp.2d 343, 349 (S.D.N.Y.2001). The registration certificates state that the first publication of the TalstarOne label was July 1, 2003. Nevertheless, even without a registration certificate, a plaintiff may establish copyright ownership' by demonstrating (1) the work possesses "some minimal degree of creativity," and (2) that it was independently created by the author. *Feist*, 499 U.S. at 358, 111 S.Ct. 1282. The originality requirement established by the Copyright Act, as interpreted in *Feist*, is not stringent. It excludes from copyright protection only "a narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent." *Id.* at 359, 111 S.Ct. 1282 (citation omitted).

CSI challenges FMC's right to claim a copyright. However, consistent with *Mazer, supra*, in the consumer products context,[39] courts have found that labels containing more than a mechanical lists of ingredients manifest the amount of creativity necessary to enjoy copyright protection. *See Sebastian Int'l, Inc. v. Consumer Contact (PTY) Ltd.*, 664 F.Supp. 909, 913 (D.N.J.1987), *rev'd on other grounds*, 847 F.2d 1093 (3d Cir.1988); *Drop Dead Co. v. S.C. Johnson & Son*, 326 F.2d 87, 92–93 (9th Cir.1963), *cert. denied*, 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 177 (1964) (copyright on aerosol wax product label

held valid); *Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*, 266 F.2d 541, 545 (2d Cir.1959) (defendant's use of identical pictures on cake labels infringed plaintiff's copyrights on the labels); *see also, X–IT Products, LLC v. Walter Kidde Portable Equipment, Inc.*, 155 F.Supp.2d 577, 609–11 (E.D.Va.2001) (labels as a whole are copyrightable even if individual component parts, such as words, are not); *Abli Inc. v. Standard Brands Paint Co.*, 323 F.Supp. 1400, 1403 (C.D.Cal.1970) (label for plastic beads found original and subject to copyright protection).

In *Sebastian*, for example, the district court found the language of a descriptive and instructive label was protected by copyright. The label at issue in the case was printed on a hair styling product. It read, in relevant part:

> Hair stays wet-looking for as long as you like. Brushes out to full-bodied dry look ... WET is not oily, won't flake and keeps hair wet-looking for hours, allowing you to sculpture, contour, wave or curl. It stays looking wet until it's brushed out. When brushed, hair looks and feels thicker, extra full. Try brushing partly, leaving some parts wet for a different look.

664 F.Supp. at 913. The *Sebastian* court also found that this language was "more than simply a list of ingredients, directions, or a catchy phrase." *Id.* Rather, the court observed, "[n]o one can seriously dispute that if plaintiff were to discover that a competitor's package utilized **exactly the same language as above with the**

---

**39.** The labels and purported copyrightable content at issue here, for competing insecticides/termiticides, are not consumer products, but commercial or industrial in nature. Consistent with *Mazer, supra,* such a distinction should not have significant distinguishing effect on the copyright analysis. In *Mazer*, 347 U.S. at 218, 74 S.Ct. 460, the Supreme Court held:

> We find nothing in the copyright statute to support the argument that the intended use or use in industry of an article eligible for copyright bars or invalidates its registration. We do not read such a limitation into the copyright law. (emphasis added).

**exception of the product's name,** plaintiff would be entitled to protection." *Id.* Here, a similar argument is before this Court, given that it is obvious that the only substantive difference between the FMC label and the CSI label is the product name.[40]

To assist the Court's analysis and comparison of the two labels, FMC provided the Court with a color-coded comparison of its label and the CSI Bifen I/T label. *See* Ex. D to Motion for TRO.[41] A comparison of the two labels reveals only one meaningful difference—the product name. The virtually identical nature of the labels easily meets the standard for substantial similarity. *See Klitzner Indus., Inc. v. H.K. James & Co., Inc.,* 535 F.Supp. 1249, 1255–57 (E.D.Pa.1982) (a close parallel between the two works is sufficient to demonstrate similarity). FMC registered its copyright to prove ownership and has shown both CSI's access and substantial similarity. Therefore, even had there been no admission of verbatim copying by CSI, FMC has demonstrated that it is likely to succeed on the merits of its claim.

**(b) FMC Will Suffer Irreparable Harm if the Injunction is Denied**

■ It is well-settled that a copyright plaintiff who makes out a *prima facie* case

of infringement is entitled to a preliminary injunction without a detailed showing of irreparable harm. *Apple Computer,* 714 F.2d at 1254 (citing NIMMER ON COPYRIGHT § 14.06[A], at 14–50, 14–51 & n. 16), *cert. denied,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984).[42]

■ Irreparable harm is an injury that "cannot be redressed by a legal or equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight,* 882 F.2d 797, 801 (3d Cir.1989). An irreparable injury is one that "is not remote or speculative, but actual and imminent and for which monetary damages cannot adequately compensate." *Air Transport Int'l L.L.C. v. Aerolease Financial Group, Inc.,* 993 F.Supp. 118, 123 (D.Conn.1998) (citing *Jayaraj v. Scappini,* 66 F.3d 36, 39 (2d Cir.1995)). The loss of goodwill or a company asset can constitute irreparable harm if such a loss will be difficult to quantify at trial. *See Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 38 (2d Cir.1995). Competitive injuries and loss of goodwill are types of injuries that are difficult to quantify. *See Basicomputer Corp. v. Scott,* 973 F.2d 507, 512 (6th Cir.1992). Moreover, with regard to alle-

---

**40.** However, an analysis comparing the two versions is not even required here, given that CSI's Blake testified that not only did CSI copy the FMC label directly from the EPA's website, but such a practice of copying is CSI's standard operating procedure and business practice once CSI identifies a product to add to its product line. CSI merely goes into the marketplace, finds product(s) in an area that it wishes to compete and copies the label for that product nearly word-for-word. Little to no attempt is made to modify any content within the label. CSI merely changes the name of the original product with the name it has assigned for its generic version. Furthermore, CSI alleges that such copying is the industry practice among generic pesticide producers.

**41.** The language highlighted in yellow on the CSI label was copied from FMC's label. The language highlighted in blue is language required by the EPA. Original language in the CSI Bifen I/T label is highlighted in orange. The **only** words in the **47–page CSI label** that are color-coded in orange are a few sentences of warranty information and the **one mention** of the product name, "Bifen I/T."

**42.** A more detailed showing of irreparable harm is required at the trial on the merits. Here, as discussed *supra* and *infra*, FMC has made out a *prima facie* case of infringement and therefore is entitled to a rebuttable presumption of irreparable injury. *See Educational Testing,* 793 F.2d at 534–44; *Apple Computer,* 714 F.2d at 1254.

gations of copyright infringement, irreparable harm may be presumed to follow from an invasion of the "'right to the exclusive use of the copyrighted material.'" *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1094 (2d Cir.1977) (*quoting American Metropolitan Enterprises of New York v. Warner Brothers' Records, Inc.*, 389 F.2d 903, 905 (2d Cir.1968)); *see also, Dynamic Solutions, Inc. v. Planning & Control, Inc.*, 646 F.Supp. 1329, 1337 (S.D.N.Y.1986) ("I do not see how plaintiff could quantify the damages resulting from a wrongful deprivation of its economic leverage as sole lawful licensor. I adhere to my view that this is sufficient to satisfy the irreparable harm requirement.") (internal quotations omitted).

At the preliminary injunction phase in a copyright infringement case, the prevailing view is that a showing of a *prima facie* case of copyright infringement, or reasonable likelihood of success on the merits, **raises a presumption of irreparable harm.** *Apple Computer*, 714 F.2d at 1254 (emphasis added); *See also, e.g., Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 620 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982); *Wainwright Securities Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 94 (2d Cir.1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978); *Klitzner Industries, Inc. v. H.K. James & Co.*, 535 F.Supp. 1249, 1259 (E.D.Pa.1982); *Custom Decor, Inc. v. Nautical Crafts Inc.*, 502 F.Supp. 154, 157 (E.D.Pa.1980).

In fact, the court in *Kontes Glass Co. v. Lab Glass, Inc.*, 373 F.2d 319, 320–21 (3d Cir.1967), suggested that there may exist an inverse relationship approach to the irreparable harm issue, requiring a balancing of the strength of the showing of irreparable injury as it varies inversely with the strength of plaintiff's showing of a likelihood of success on the merits. *See Apple Computer, supra; Midway Mfg. Co. v. Bandai–America, Inc.*, 546 F.Supp. 125, 141–42 (D.N.J.1982). In *Kontes*, the court was not presented with a case in which the allegedly infringed copyrighted material was central to the essence of plaintiff's operations. *See Apple Computer*, at 1254. However, here, as discussed above, because the required label and the pesticide/termiticide product are not viable independent products and because the unit of the bottle its label together is central to the essence of this line of FMC's business, this Court believes, as did the court in *Apple Computer*, that "the *Kontes* approach is best suited to those cases where the injury from copying can be fairly considered minimal, limited or conjectural." In such circumstances, flexibility in applying the equitable remedy of a preliminary injunction by evaluating the irreparable harm factor is a compelling rubric. *See Apple Computer*, 714 F.2d at 1255. In the present case, of course, because the copying was willful, wholesale and verbatim, it would be difficult to find that the harm resulting from such a situation also could be considered "minimal, limited or conjectural." *See id.* Moreover, "[n]ormally, [ ] the public interest underlying the copyright law requires a presumption of irreparable harm, as long as there is, as here, adequate evidence of the expenditure of significant [creativity,] time, effort and money directed to the production of the copyrighted material. Otherwise, the rationale for protecting copyright, that of encouraging creativity, would be undermined." *Id.* And, as a practical matter:

[s]ince Congress has elected to grant certain exclusive rights to the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly,

preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work. *Apple Computer,* 714 F.2d at 1255 (*quoting Klitzner,* 535 F.Supp. at 1259–60).

 Based on the evidence presented thus far, this Court is unable to embrace CSI's concern with regard to the supposed devastating effect a preliminary injunction could have on its business. If the Court were to accept such an argument as preventing the issuance of an injunction on these facts, then, in the future, "a knowing infringer would be permitted to build its business around its infringement, a result we cannot condone." *Id. See also, Atari, Inc. v. North American Philips Consumer Electronics Corp.,* 672 F.2d at 620; *cf. Helene Curtis Industries, Inc. v. Church & Dwight Co.,* 560 F.2d 1325, 1333 (7th Cir. 1977) (trademark infringement), *cert. denied,* 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978). Neither the size of the infringing party nor that of the aggrieved party is determinative of the copyright holder's ability to get prompt and appropriate judicial redress. *Apple Computer,* 714 F.2d at 1255.

Furthermore, on this record, FMC's TalstarOne product maintains its market position by engaging in lawful competitive behavior. FMC has demonstrated that the cost of developing its label far exceeds the cost of CSI's efforts of duplication. FMC also provided evidence of the significant and considerable creativity, effort, time and money spent not only developing the label at issue, but also developing and promoting the TalstarOne product. Froelich Decl. ¶¶ 16–22. Thus, even without the presumption of irreparable harm applied in copyright cases, the potential harm or jeopardy to FMC's investment and lawful competitive position caused by CSI's wholesale copying of FMC's label

represents and satisfies the quantum of irreparable harm needed to support a preliminary injunction here.

To decline to issue a preliminary injunction on this record would condone the inequitable manner in which CSI or others emulating its business practices in this regard bring their products to market and violate the tenets upon which copyright protections are based.

### (c) Is There a Heightened Standard of Irreparable Harm if the Infringed Item is Merely Peripheral to Copyrighted Holder's Business?

 CSI also contends, however, that because the labels to TalstarOne have allegedly been infringed, only material peripheral to the FMC's business has been infringed, and, thus, a stronger showing of irreparable harm is required as FMC's likelihood of success on the merits wanes. *Video Pipeline,* 342 F.3d at 206 (citing *Marco v. Accent Publ'g Co.,* 969 F.2d 1547, 1553 (3d Cir.1992)). The Court finds such a rule inapplicable here. As discussed above, because of the unique regulatory-based relationship between the product labels and the products themselves, this Court finds that the pesticide/termiticide product labels are not peripheral to FMC's core business. Moreover, even if this Court was to consider here the likely harm that would flow only to the product labels, and that the production of product labels is only peripheral to FMC's business, FMC has shown a sufficiently strong likelihood of success on the merits, and so it need not make a particularly strong showing of irreparable harm. *See cf. Video Pipeline,* 342 F.3d at 206. Regardless, the current record indicates that FMC may be incurring incalculable losses from CSI's unlawful and inequitable competition. *Id.* at 206–07. FMC will likely suffer irreparable harm if CSI is not enjoined from using the

infringing label on Bifen I/T. *Id.* at 207. "Moreover, given the verbatim copying, lack of creative ingenuity, and profit-driven purpose of the [CSI label], we have no concern that this case is one in which the creative and expressive goals of copyright law would be served better by [granting] an injunction." *Id.* (citing *Campbell*, 510 U.S. at 578 n. 10, 114 S.Ct. 1164).

### (d) The Balance of Harm Favors FMC

█ CSI deliberately disregarded the copyright law by never attempting to analyze whether a copyright protects the copied TalstarOne product label. CSI also ignored FMC's demand when notified that the Bifen I/T label infringed FMC's TalstarOne label. CSI continues to violate FMC's copyright, inflicting harm upon FMC.[43] Conversely, CSI will suffer little harm by merely being ordered to stop infringing FMC's copyright and properly bring its product to the market after submitting a me-too registration with a non-infringing label. The Bifen I/T product is merely one source of revenue for CSI. CSI currently has at least 150 products in the market. *See* 4/22/05 Hr. Tr. at 124. During the preliminary injunction hearing, Mr. Blake testified as to CSI's gross revenues for 2004 and projections for 2005:

> [Mr. Squires:] Do you know what [CSI's] gross revenues were for the year 2004?
> [Mr. Blake:] Between 40 and 50 million.
> Q Do you know how much of that revenue was derived from sales of [Bifen I/T]?
> A From 2004?
> Q For 2004.
> A Approximately a million.
> Q And do you—has the company projected sales for the year 2005?
> A I've been told that the projections could be as high as five million.
> Q For the sale of [Bifen I/T]?
> A In 2005.
> Q What would be the consequence to the company if it were ordered by the Court to immediately stop offering the label that is part of the product when it is sold?
> A We would lose the projected ... whatever our sales would be from that point on, in this case it would be $5 million projected.
> Q Would you try to rewrite the label?
> A I'm not sure how I could do that.
> Q Okay. If you were to rewrite the label, would you have to submit it for approval to the EPA?
> A Yes.
> Q Do you know how long it would take to get such approval?
> A If they viewed it as a me-too with expedited review, then it could be as—it could take a three-month time frame, and, if not, then it would take the eight-month time frame.

---

43. As of the date of preliminary injunction hearing and oral argument, April 21 and 22, 2005, CSI's witness testified that CSI had taken no steps to create its own independently produced label.

4/22/05 Hr. Tr. at 102 (emphasis added). Along with the 2005 projections for Bifen I/T, CSI also estimates that its gross revenues for 2005 are likely to increase significantly:

[Ms. Fletman:] What's the projection for total gross revenues for the company for [2005]?

[Mr. Blake:] Between 60 and 70 million.

Q Okay. So, 2004, you had 40 to 50 million gross sales, is that right?

A Yes, ma'am.

Q And next year you expect 60 to 70 million in gross sales?

A Yes, ma'am.

Q So that's basically an increase of 20 million?

A Yes, ma'am.

Q And you said that sales of [Bifen I/T]could be as high as five million, is that right?

A Yes, ma'am.

Q But they also could be as low as what you've sold already?

A To the best of my knowledge, yes, ma'am, that could be

true.

4/22/05 Hr. Tr. at 125–26.

Nevertheless, if CSI invests in an effort to draft a paraphrased FMC-type label, CSI will likely secure a me-too registration. Mr. Blake admitted that if CSI is forced to modify its label, and if CSI can do so such that the new Bifen I/T label qualifies for expedited review, CSI is merely going to miss three months of revenue for the Bifen I/T after the new label is drafted. *See* 4/22/05 Hr. Tr. at 133.

FMC requests only that CSI stop making or using the infringing labels, and that it take back any unsold product that contain the infringing labels.[44] Despite the fact that FMC is unable to quantify the harm visited upon it, further sales to end users can be enjoined and further injury prevented. CSI was put on notice by FMC's February 2005 cease and desist letter, yet CSI chose to continue its course of conduct. After the cease-and-desist letter was received, CSI extended and expanded the breadth and responsibility for infringement (and potential damage to FMC) by granting sub-registration rights to Phoenix, which, at the behest of CSI, also is using a label substantially similar to TalstarOne.[45] The Court agrees with FMC which has argued that any harm that CSI suffers from the issuance of a preliminary injunction is the result of CSI's own behavior. *See SmithKline Beecham Consumer Healthcare v. Watson Pharmaceu-*

---

**44.** To be clear, the Court is not ordering that CSI facilitate a recall of the infringing products, but rather for CSI to notify all of its customers and sub-registrants that they may not continue to sell (or facilitate the sale of) the products subject to this matter until, consistent with this opinion, a non-infringing EPA-approved label is affixed to the Bifen I/T product. A recall of the product is not necessary if arrangements can be made to affix new labels to the CSI product before further distribution takes place.

**45.** As of the date of the hearing and oral argument, CSI had not provided two sub-registrants of Bifen I/T, Phoenix and Regal, with courtesy notice that the template for their product label was being subjected to this copyright infringement action, subject to extraordinary injunctive relief and the potential for damages. *See* 4/22/05 Hr. Tr. at 118–120. Furthermore, even after it received the cease-and-desist letter, CSI continued to aid continued infringement by Phoenix. *See* 4/22/05 Hr. Tr. at 133–35.

*ticals, Inc.* (*SmithKline I* ), 63 F.Supp.2d 467, 472–73 (S.D.N.Y.1999).

#### (e) The Public Interest Is Best Served by Protecting FMC's Copyright

 Protecting a company's rights to its intellectual property is in the public interest.

*Klitzner*, 535 F.Supp. at 1259–60 ("the public interest can only be served by upholding copyright protections and, correspondingly, preventing misappropriation of the skills, creative energies, and resources [that were] invested in the protected work"). Here, the record supports FMC's argument that it has invested considerable creativity, talent, resources, time and money to develop the TalstarOne label. The public interest is not served by permitting CSI to pilfer and profit from FMC's copyrighted work product. FMC has a right to expect that the tangible and intangible resources expended to research, design and produce its copyrighted product labels will be protected by law.

Here, based on FMC's *prima facie* infringement case and its likelihood of success against CSI's asserted affirmative defenses, discussed *infra*, at this stage, the Court presumes FMC will suffer irreparable injury if a preliminary injunction does not issue. As the *Video Pipeline* court reiterated, generally, "a showing of a prima facie case of copyright infringement or reasonable likelihood of success on the merits raises a presumption of irreparable harm." *Apple Computer, Inc.*, 714 F.2d at 1254.

#### 3. CSI's Other Affirmative Defenses

#### (a) The "Fair Use" Affirmative Defense

 The constitutional *quid pro quo* of a copyright "is intended to motivate the creative activity of authors ... by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." *Video Pipeline*, 342 F.3d at 197 (*quoting Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)). Occasionally, however, "rigid application of the copyright statute ... would stifle the very creativity which that law is designed to foster." *Id.* (*quoting Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 577, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994)). Under such conditions, an analysis under the "fair use" doctrine may be triggered. CSI raises it here.

The judicially created "fair use" defense is codified at § 107 of the Copyright Act, and permits a "fair use of a copyrighted work." 17 U.S.C. § 107. A garden-variety fair use, is one made "for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research." *Id.* A claim of "fair use" is an affirmative defense for which the alleged infringer bears the burden of proof. *Video Pipeline*, 342 F.3d at 197.

To determine whether a particular use is fair, a court must consider the following non-exhaustive list of factors:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107; *id.* at 197–98. Each statutory factor should "be explored, and the results weighed together, in light of the purposes of copyright." *Id.* (*quoting Campbell*, 510 U.S. at 578, 114 S.Ct. 1164

(citations omitted)). Thus, as a court applies copyright law, and the fair use doctrine in particular, the court should bear in mind its purpose to encourage "creative activity" for the public good. *Sony Corp.*, 464 U.S. at 429, 104 S.Ct. 774.

### (1) The Purpose and Character of the Use, Including Whether Such Use is of a Commercial Nature Or is For Nonprofit Educational Purposes

It cannot be disputed that the nature of the work at issue, FMC's TalstarOne label, is commercial. *Compare,* "[a]ny commercial use tends to cut against a fair use defense," *Triangle Pub'l, Inc. v. Knight–Ridder Newspapers,* 626 F.2d 1171, 1175 (5th Cir.1980), *with,Infinity Broadcast v. Kirkwood,* 150 F.3d 104, 109 (2d Cir.1998) (where the court discussed that the commercial nature of an allegedly infringing work is not necessarily dispositive and may be of "only limited usefulness to a fair use inquiry."). *See also* NIMMER ON COPYRIGHT § 13.05[A][1][c] (the court may consider whether the alleged infringing use was primarily for public benefit or for private commercial gain). The more revenue obtained as a result of an infringer's use of the copyrighted work, the "less likely the use will be considered fair." *Id.* Here, CSI's Head of Regulatory Affairs testified that CSI sold approximately $1 million of the Bifen I/T product in fiscal year 2004, and is projecting sales of $5 million in fiscal year 2005. This testimony, presuming that CSI is obtaining a fair profit on these sales, tends to negate CSI's fair use defense.

Most significantly, "where the copier uses none of his own creative activity to transform the original work, holding the fair use doctrine inapplicable will not likely interfere with copyright's goal of encouraging creativity." *Video Pipeline,* 342 F.3d at 198. Here, during the evidentiary hearing and oral argument, CSI made no adequate showing that the admittedly infringing Bifen I/T label is entitled to a finding of fair use. Moreover, to paraphrase our circuit's Court of Appeals, because CSI used none of its own creative activity to draft the Bifen I/T label, public policy encourages a denial of the fair use defense. *See id.* Thus, on this record, because CSI admitted that it engaged in wholesale copying of FMC's TalstarOne label, no further analysis of the "fair use" affirmative defense is necessary. *Id.; see also, Campbell,* 510 U.S. at 580, 114 S.Ct. 1164 (If "the alleged infringer merely uses [the original work] to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger.").

### (2) The Nature of the Copyrighted Work–Do the Label and the Product have Value as Separate Items?

The second factor, namely, the nature of the copyrighted work, offers greater protection to those works that include more creativity than works of a more informational nature. NIMMER ON COPYRIGHT at § 13.05[A][2][a]. Typically, this factor "recedes into insignificance" in determining fair use. *Id.* Moreover, courts do not hesitate to deny the fair use defense even when the work is "nonfiction." *See Robinson v. Random House, Inc.,* 877 F.Supp. 830, 841 (S.D.N.Y.1995).

CSI argues that no market exists or could exist for the TalstarOne product label itself because no one "ever paid or will ever pay any money merely [for a pesticide product label]." *See cf. Video Pipeline,* 342 F.3d at 202. Instead, CSI argues, the only market is for the underlying pesticide/termiticide product. However,

CSI's argument is of no moment because it takes too narrow a view of the potential harm to FMC and because it fails to consider that because the product and its labels are heavily regulated by the EPA, neither the product label nor the pesticide/termiticide can exist in the marketplace without the other. A fully symbiotic relationship exist between the two: the label has no intrinsic value without the product to which it is affixed; and the product has no value without the label, without which it cannot be lawfully distributed.

### (3) The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole

As for the third factor, fair use generally is not a defense if an entire work is reproduced. NIMMER ON COPYRIGHT § 13.05[A][3]; see also, Infinity Broadcast, 150 F.3d at 109 (reversing summary judgment granted to defendant telephone service provider on fair use grounds, holding that the more of a copyrighted work that is taken, the less likely the use is to be fair). Here, CSI admits it copied the entire TalstarOne label except for the product name and some of the warranty language.

### (4) The Effect of the Use Upon the Potential Market For Or Value of the Copyrighted Work

The fourth factor "poses the issue of whether unrestricted or widespread conduct of the sort engaged in by the defendant [ ... or others] would result in a substantially adverse impact on the potential market for, or value of, the plaintiff's present work." NIMMER ON COPYRIGHT § 13.05[A][4]. This factor is satisfied when the infringing works compete in the same market and defendant's work threatens to supersede plaintiff's works. Nihon Keizai

Shimbun, Inc. v. Comline Business Data, Inc., 166 F.3d 65, 73 (2d Cir.1999). Such a threat exists in the instant matter. ·

Therefore, balancing each of the fair use factors, CSI cannot avail itself of the defense of fair use because it copied the entire FMC label, changed only the name, uses the infringing label on its own Bifen I/T product, distributes containers of Bifen I/T with the infringing label, and, despite FMC's cease and desist letter, continued and enlarged the infringement by providing the infringing label to two other generic pesticide sub-registrants in the same market.

### (b) The Copyright Misuse Affirmative Defense

 The Court of Appeals for the Third Circuit has affirmatively recognized the copyright misuse doctrine. Video Pipeline, 342 F.3d at 206. The misuse doctrine is based upon the equitable principle that courts "may appropriately withhold their aid where the plaintiff is using the right asserted contrary to the public interest." Morton Salt v. G S Suppiger Co., 314 U.S. 488, 492, 62 S.Ct. 402, 86 L.Ed. 363 (1942). Furthermore, "the subsequent registration of a work of art published as an element in a manufactured article, is [not] a misuse of the copyright." Mazer, 347 U.S. at 218, 74 S.Ct. 460. Misuse is not cause to invalidate the copyright or patent, but instead "precludes its enforcement during the period of misuse." Practice Management Info. Corp. v. American Med. Assoc., 121 F.3d 516, 520 n. 9 (9th Cir.1997) (citing Lasercomb America, Inc. v. Reynolds, 911 F.2d 970, 979 n. 22 (4th Cir.1990)). To defend on misuse grounds, the alleged infringer need not be subject to the purported misuse. Morton Salt, 314 U.S. at 494, 62 S.Ct. 402 ("It is the adverse effect upon the public interest of a successful infringement suit in

conjunction with the patentee's course of conduct which disqualifies him to maintain the suit, regardless of whether the particular defendant has suffered from the misuse of the patent."); *Lasercomb,* 911 F.2d at 979 ("[T]he fact that appellants here were not parties to one of Lasercomb's standard license agreements is inapposite to their copyright misuse defense. The question is whether Lasercomb is using its copyright in a manner contrary to public policy, which question we have answered in the affirmative."). *Id.* at 204.

 Copyright misuse may exist where the holder engages in some type of anti-competitive behavior, such as using a license to the copyright in an anti-competitive manner. *See, e.g., Practice Management,* 121 F.3d at 521 (finding copyright misuse where license to use copyrighted good prohibited licensee from using competing goods); *Lasercomb,* 911 F.2d at 979 (holding the copyright holder misused its copyright by including within the licensing agreements a provision that neither the licensee company nor its officers or employees, was permitted to develop competing goods during the 99 year term of the agreement).

As a matter of policy concern, anti-competitive licensing agreements can conflict with the underlying purpose of copyright's protection by depriving the public of a potential competitor's creativity. *Video Pipeline,* 342 F.3d at 205. Similarly, "[t]he fair use doctrine and the refusal to copyright facts and ideas also address applications of copyright protection that would otherwise conflict with a copyright's constitutional goal." *Id.* (quoting *Eldred v. Ashcroft,* 537 U.S. 186, 219–220, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003); *see also, Campbell,* 510 U.S. at 575 n. 5, 114 S.Ct. 1164). However, it is entirely possible that a copyright holder could, lawfully and consistent with public policy, "leverage its copyright to restrain the creative expression of another without engaging in anti-competitive behavior or implicating the fair use and idea/expression doctrines." *Id.* (footnote omitted). In the instant matter, such a possibility exists. Because FMC has demonstrated that it is in fact possible for a competitor in the termiticide/insecticide field to modify a label and compete, FMC's choice not to grant a license to CSI could not be seen as copyright misuse.

### (c) Laches

 CSI argues that FMC's delay in bringing its copyright infringement action should weigh against entry of a preliminary injunction. The Court assumes that CSI is asserting a laches argument and will address CSI's affirmative defense of undue delay as such. Nevertheless, for the reasons stated herein, the Court finds CSI's argument unpersuasive and unsupported by the factual record thus far established.

As discussed above, FMC first acquired a copy of the allegedly infringing CSI label in March 2004. However, at that time, on the current record, it appears that FMC's only interest in reviewing CSI's label was to determine whether CSI should compensate FMC for the data submission that CSI would have been obligated to provide to the EPA for approval of Bifen I/T, with such data having been originally compiled and reported by FMC for its bifenthrin-based product. In fact, such a discussion between FMC and CSI is borne out in a March 1, 2004 letter from Lawrence A. Miller, Consultant to CSI, to David B. Weinberg, Esq., outside counsel to FMC:

> I have enclosed a copy of each product label for your convenience. FMC may want to review the pest claims on these labels as they relate to any efficacy stud-

ies that might have been submitted to the [EPA] to support such claims.

Ex. D–12. CSI has not provided any evidence to refute FMC's claim that no one at FMC contemplated a copyright infringement action until November 2004 and that approval for an internal investigation on that issue was granted in December 2004. By February 2005, FMC had completed its comparison of the TalstarOne and Bifen I/T labels, concluding that CSI's Bifen I/T label is a nearly-verbatim copy of FMC's TalstarOne label. FMC promptly sent CSI a cease-and-desist letter in March 2005. Thereafter, upon CSI's failure to comply with the cease-and-desist letter, FMC filed the instant Complaint in this Court. A day later, FMC filed papers requesting injunctive relief.

 CSI, as the party asserting laches as an affirmative defense, must establish (1) an inexcusable delay in bringing the action and (2) prejudice. *See Mushroom Transportation Co., Inc.*, 382 F.3d 325, 337 (3d Cir.2004) (citing *United States Fire Ins. Co. v. Asbestospray, Inc.*, 182 F.3d 201, 208 (3d Cir.1999) (citations omitted)). "To establish prejudice, the party raising laches must demonstrate that the delay caused a disadvantage in asserting and establishing a claimed right or defense; the mere loss of what one would have otherwise kept does not establish prejudice." *Id.* (citation omitted). The length of the alleged delay and other matters of historical circumstance are questions of fact. *E.E.O.C. v. Great Atlantic & Pacific Tea Co.*, 735 F.2d 69, 81 (3d Cir. 1984). The duty to bring an action for alleged copyright infringement does not arise until the plaintiff learns of the alleged infringement. *See MacLean Assoc., Inc. v. William M. Mercer–Meidinger–Hansen, Inc.*, 952 F.2d 769, 780 (3d Cir. 1991). An unreasonable delay in seeking an injunction negates the presumption of irreparable harm. While courts have denied injunctive relief based on laches, "the laches defense is reserved for those rare cases where a protracted acquiescence by plaintiff induces a defendant to undertake substantial activities in reliance on the acquiescence." *Estate of Presley v. Russen*, 513 F.Supp. 1339,1351 (D.N.J.1981) (*quoting McNeil Laboratories, Inc. v. American Home Products Corp.*, 416 F.Supp. 804, 809 (D.N.J.1976)) (internal quotations omitted). However, the Court of Appeals for the Third Circuit has held that the "conscientious decision to fully investigate the very serious [infringement] charges before filing suit" will not give rise to a viable laches defense. *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.*, 229 F.3d 254, 264 (3d Cir.2000). Moreover, "to the extent that delay can justify denial of a motion for a preliminary injunction, 'a delay caused by a plaintiff's good faith efforts to investigate an infringement' or to determine how serious an infringement is does not preclude a finding of irreparable harm." *Id.* (*quoting Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 39 (2d Cir.1995)) (internal citation omitted). In a copyright infringement action, the clock starts running with regard to whether a delay is unreasonable only when the putative plaintiff has actual knowledge of the alleged copying. *Tienshan, Inc. v. C.C.A. Int'l, Inc.*, 895 F.Supp. 651, 654–55 (S.D.N.Y. Aug. 18,1995); *cf. Tom Doherty*, 60 F.3d 27, 39–40 (2d Cir.1995).

In *Tienshan*, for example, the court determined that the plaintiff may have known of the allegedly infringing tableware box design approximately 16 months before the company brought its infringement action. The plaintiff obtained a preliminary injunction despite the delay. *Tienshan*, 895 F.Supp. at 660. Additionally, analogizing the facts in the instant matter to those in *Tienshan*, 895 F.Supp. at 654–55, there is no reason for this Court to

conclude that FMC's outside lawyer who was concerned "with regard to bifenthrin data compensation matters," *see* Ex. D–11 and D–12, would somehow compare the competing labels for copyright purposes.

In *Tom Doherty*, the court also held that a delay in filing suit, with regard to alleged copyright infringement of a license, would not rebut the presumption of irreparable harm where the plaintiff was initially unaware of the severity of the alleged infringement. 60 F.3d at 39; *see also, Clifford Ross Co. v. Nelvana, Ltd.,* 710 F.Supp. 517, 521 (S.D.N.Y. Apr.13,-1989), *aff'd without opinion,* 883 F.2d 1022 (2d Cir.1989). The *Tom Doherty* court affirmed the grant of a preliminary injunction to a publisher of children's books that delayed bringing suit for approximately four months. 60 F.3d at 40. The publisher had a contractual right of first refusal to publish books based on then highly popular television characters created by defendant Saban Entertainment. *Id.* at 31–32. In that case, one of the plaintiff's executives who first learned that Saban Entertainment was licensing the television characters to competitors failed to inform company counsel but testified she tried to contact Saban Entertainment about publishing the books months later. *Id.* at 32. Deciding to grant the injunction, the district court found that the employee (not unlike FMC's Froelich in this case) who first became aware of the improper licensing was not a lawyer, was unaware of the actual terms of the contract, and did not believe she had a right to prevent defendant's licensing to competitors. *See id.* at 32, 40; *cf. Playboy Enters. v. Chuckleberry Publishing,* 486 F.Supp. 414, 434–35 (S.D.N.Y. Feb. 6, 1980) ("parties should not be encouraged to sue before a practical need to do so has been clearly demonstrated"); *King v. Innovation Books,* 976 F.2d 824, 831 (2d Cir.1992) (a delay caused by plaintiff's good faith efforts to investigate

an infringement does not rebut the presumption of irreparable harm).

CSI's reliance on *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276–77 (2d Cir.1985), is misplaced. The issues in *Citibank* revolved around trademark infringement and that court found that the plaintiff delayed for nine months before filing its request for the grant of a preliminary injunction. However, *Citibank* is distinguishable on its facts, where the court found that the plaintiff had previously opposed the defendants' application for the allegedly infringing trademark and then delayed bringing its claim. *Id.*

CSI's reliance on *Majorica, S.A. v. R.H. Macy & Co., Inc.,* 762 F.2d 7, 8 (2d Cir. 1985) is misplaced in light of our circuit's holding in *BP Chemicals,* 229 F.3d at 264. While CSI is correct in stating that "[l]ack of diligence, standing alone ... may ... preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm," *Majorica,* 762 F.2d at 8, FMC's "conscientious decision to fully investigate the very serious [infringement] charges before filing suit" does not give rise to a viable laches defense. *See BP Chemicals,* 229 F.3d at 264.

Therefore, on these facts and consistent with the applicable law, the Court finds that, under the circumstances, FMC acted sufficiently promptly in bringing the instant action for alleged copyright infringement.

**(d) Unclean Hands**

■ CSI's next argument intimating unclean hands by FMC also lacks merit. On this record, absolutely no evidence of significance, with regard to unclean hands, exists. CSI focuses on the fact that the FMC label contains the now-expired patent registration number for bifenthrin. Although CSI suggests that FMC's "mo-

tive" for erroneously including that reference is to give the false impression that FMC's product is protected by patent, CSI has failed to establish with evidence any improper motive by FMC for continuing to include the patent number for bifenthrin on the label for its Talstar products.

The defense of unclean hands in a copyright infringement action "is recognized only rarely, when the plaintiff's transgression is of serious proportions and relates directly to the subject matter of the infringement action." NIMMER ON COPYRIGHT § 13.09[B]. The unclean hands defense should be rejected when the "plaintiff's transgression is of an extraneous, immaterial, or inconsequential nature, or possibly when the defendant has been guilty of conduct more unconscionable and unworthy than the plaintiff's." Id.

Although the Patent Act imposes a duty to mark products covered by a patent, there is no stated corresponding duty to remove the patent number on a product whose patent has expired. See 7 CHISUM ON PATENTS § 20.03[7][c]. Section 292 of the Patent Act prohibits three types of false markings: (1) counterfeit marking (i.e., use of a patent mark without the patent owners' permission); (2) false patent marking (i.e., the use of a patent mark on an unpatented article); and (3) false patent pending marking (i.e., the use of the phrase "patent applied for" or "patent pending" when no patent application covering the article is in fact pending). Id. at § 20.03[7][c][vii].

A claim for false marking fails absent evidence of an actual intent to deceive. See Mayview Corp. v. Rodstein, 620 F.2d 1347, 1360 (9th Cir.1980) ("an actual intent to deceive the public is required for a violation of 35 U.S.C. § 292"); High Frequency Products, Inc. v. Wynn's Climate Systems, Inc., 892 F.Supp. 1515, 1519 (S.D.Fla.1995), aff'd, 91 F.3d 167, 1996 WL 217840 (Fed.Cir.1996) (unpublished opinion) (same). Furthermore, the burden of proof on intent of a Section 292 offense rests on the party making the charge. CHISUM ON PATENTS § 20.03[7][c][vii]. Scant authority exists as to "whether continued use of a patent number on an article after expiration of the patent constitutes culpable mismarking." Id. FMC's patent on bifenthrin expired in 1997. This Court finds no reason why FMC may not display its patent number to inform the public of where to acquire the informational and teaching quid pro quo that underlies the granting of patent protection. Moreover, in the absence of a scintilla of evidence that FMC acted with intent to deceive, one might conclude that CSI's conduct here— the deliberate copying of FMC's label—is "more unconscionable and unworthy than the plaintiff's." See NIMMER ON COPYRIGHT § 13.09[B].

## IV. CONCLUSION

To quickly enter the same market, Defendant CSI took an impermissible shortcut. Instead of investing resources the necessary to develop an independent product label, CSI simply appropriated FMC's existing copyrighted labels. Wholesale copying, as CSI did with FMC's label, is not consistent with the statutes, regulations or process mandated by the EPA for having a me-too pesticide registered to permit the sale of a generic pesticide product.

With regard to the allegedly infringing Bifen I/T label, CSI invited the Court engage in a rather wooden review of the applicable statutes, regulations and case law interpretations of the Copyright Act of 1976 and its relationship to the instant matter. Engaging in such a limited view, however, would eat away at the foundations of copyright law, including the well-established protections for compilations for

those works that include a modicum of originality and creative spark.

Extending copyright protection for a work such as the TalstarOne label, fulfills the objective of copyright, not to reward the labor of authors but, "[t]o promote the Progress of Science and useful Arts." *Id.* at 349 (*quoting* U.S. Const. Art. I, § 8, cl. 8); *accord, Twentieth Century Music Corp.,* 422 U.S. at 156, 95 S.Ct. 2040. There can be no doubt that the fruits of FMC's research into the effective use of its product, as expressed on the TalstarOne label, progress the science of pest extermination. No objective gardener, exterminator or other pest eradicator could disagree.

Pursuant to 17 U.S.C. § 501, FMC has convinced the Court of its high likelihood of success at trial of proving copyright infringement by CSI. On this record, FMC established that (1) it possesses legitimate copyrights in the TalstarOne and Talstar TC Flowable labels and (2) CSI admitted copying the label for Talstar TC Flowable, from which the TalstarOne label is derived. *See Dam Things,* 290 F.3d at 561; *Whelan Assocs.,* 797 F.2d at 1231. Furthermore, each of the factors to be balanced in deciding whether to grant preliminary injunctive relief weigh in FMC's favor. *See Video Pipeline, Inc.,* 342 F.3d 191.

Labels for commercial products are copyrightable. *See Mazer v. Stein,* 347 U.S. at 218, 74 S.Ct. 460. Furthermore, as the *Sebastian* court observed, "[n]o one can seriously dispute that if plaintiff were to discover that a competitor's package utilized exactly the same language as above with the exception of the product's name, plaintiff would be entitled to protection." 664 F.Supp. at 913, *rev'd on other grounds,* 847 F.2d 1093 (3d Cir.1988). Such is the case here-the only substantive difference between the labels is the product name.

What makes the instant matter fundamentally different from *SmithKline* is that the language of the Hatch–Waxman Amendments required near-verbatim copying and the FDA specifically informed the alleged infringer, Watson, and the district court in that case that, in no uncertain terms, the generic nicotine patch would not be approved if the language was not nearly identical, except for a name change. However, here, nothing in the statutory or regulatory provisions expressly applicable to pesticides (as opposed the pharmaceutical industry in *SmithKline* ) requires, mandates or excuses unauthorized copying of a competitor's product label.

Finally, on the record thus established, each of CSI's affirmative defenses also fails. CSI provided the Court with no persuasive evidentiary support for its defenses of fair use, copyright misuse, laches or unclean hands.

Therefore, in conclusion, to not grant the preliminary injunction would reward CSI's blatant copyright infringement.

An appropriate Order, including imposition of a requirement that FMC post a One Hundred Thousand Dollar ($100,-000.00) bond, follows.

### *ORDER*

AND NOW, this 16th day of May, 2005, upon consideration of the Complaint (Docket No. 1), FMC Corporation's Motion for Temporary Restraining Order and Rule to Show Cause Why a Preliminary Injunction Should Not Issue (Docket No. 3), Control Solutions, Inc.'s Memorandum In Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, the parties' supplemental submissions to the Court, the testimony and evidence presented at the preliminary injunction hearing held on April 21 and 22, 2005, and consistent with the discussion

and reasoning contained within the attached memorandum of law, **IT IS HEREBY ORDERED** that plaintiff's motion for a preliminary injunction is GRANTED as provided herein for the following reasons:

(i) FMC Corporation has a valid and enforceable copyright in its Talstar-One label;

(ii) Control Solutions, Inc., substantially copied both the arrangement and language of FMC's Talstar TC Flowable product label, a precursor of the TalstarOne label;

(iii) Control Solutions' substantial copying of the arrangement and language of the Talstar TC Flowable label was not authorized by FMC in any manner;

(iv) Control Solutions' substantial copying of the arrangement and language of the Talstar TC Flowable label does not constitute fair use;

(v) FMC did not unreasonably delay seeking relief from this Court;

(vi) Control Solutions has not established unclean hands;

(vii) FMC did not misuse its copyright in any way; and, therefore:

 (a) FMC has shown that it is likely to succeed on the merits of its federal copyright law infringement claim;

 (b) FMC will suffer irreparable harm if a preliminary injunction is not issued;

 (c) the harm to FMC against the harm to Control Solutions balances in favor of an injunction; and

 (d) the public interest favors imposition of a preliminary injunction.

Accordingly, it is **FURTHER ORDERED** that:

(1) Plaintiff FMC Corporation shall post a bond pursuant to Rules 65 and 65.1 of the Federal Rules of Civil Procedure in the amount of One Hundred Thousand Dollars (**$100,000.00**) and immediately upon receipt by Control Solutions, Inc. by electronic mail, facsimile or private delivery service of notice that such bond has been posted:

(2) Defendant Control Solutions, Inc., and anyone or any entity acting in concert with it, is immediately **ENJOINED** from manufacturing, or causing the infringing label to be manufactured;

(3) Defendant Control Solutions, Inc., and anyone or any entity acting in concert with it, is immediately **ENJOINED** from using the infringing label;

(4) Defendant Control Solutions, Inc., and anyone or any entity acting in concert with it, is immediately **ENJOINED** from placing any product that has the infringing label affixed to it into the stream of commerce;

(5) Defendant Control Solutions, Inc., and anyone or any entity acting in concert with it, shall immediately destroy all existing infringing labels;

(6) Defendant Control Solutions, Inc., shall immediately provide by facsimile, electronic mail or other expeditious means (which may include first-class U.S. mail) a copy of this Order to all of its known distributors, customers and sub-registrants for Bifen I/T and shall maintain a list of all recipients so contacted by Control Solutions, Inc. and the date(s) on and means by which Control Solutions issued the copy to each such recipient; and

(7) A Pretrial Conference will be held in Chambers (Room 5118) on Monday, June 6, 2005, at 9:30a.m. to address the schedul-

ing for a trial on the merits and other appropriate matters.

IT IS SO ORDERED.